UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE BROOKLYN BRANCH OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE,<br><br>    Plaintiff,<br><br>  -against-<br><br>PETER S. KOSINSKI, in his official capacity as Co-Chair of the State Board of Elections; DOUGLAS A. KELLNER, in his official capacity as Co-Chair of the State Board of Elections; ANDREW J. SPANO, in his official capacity as Commissioner of the State Board of Elections; ANTHONY J. CASALE, in his official capacity as Commissioner of the State Board of Elections; TODD D. VALENTINE, in his official capacity as Co-Executive Director of the State Board of Elections; ROBERT A. BREHM, in his official capacity as Co-Executive Director of the State Board of Elections; FREDERIC M. UMANE, in his official capacity as President of the New York City Board of Elections; MIGUELINA CAMILO, in her official capacity as Secretary of the New York City Board of Elections; JOSE MIGUEL ARAUJO, in his official capacity as Commissioner of the New York City Board of Elections; GINO A. MARMORATO, in his official capacity as Commissioner of the New York City Board of Elections; MICHAEL MICHEL, in his official capacity as Commissioner of the New York City Board of Elections; RODNEY L. PEPE-SOUVENIR, in her official capacity as Commissioner of the New York City Board of Elections; SIMON SHAMOUN, in his official capacity as Commissioner of the New York City Board of Elections; PATRICIA ANNE TAYLOR, in her official capacity as Commissioner of the New York City Board of Elections; TIFFANY TOWNSEND, in her official capacity as Commissioner of the New | Case No.<br><br>**COMPLAINT FOR INJUNCTIVE RELIEF AND DECLARATORY JUDGMENT** |

York City Board of Elections; JOHN WM. ZACCONE, in his official capacity as Commissioner of the New York City Board of Elections,

    Defendants.

  Plaintiff the Brooklyn Branch of the National Association for the Advancement of Colored People (the "Brooklyn Branch of the NAACP" or "Plaintiff"), by and through the undersigned counsel, files this Complaint for Injunctive Relief and Declaratory Judgment against Defendants PETER S. KOSINSKI, in his official capacity as Co-Chair of the State Board of Elections, DOUGLAS A. KELLNER, in his official capacity as Co-Chair of the Board of Elections, ANDREW J. SPANO, in his official capacity as Commissioner of the State Board of Elections, ANTHONY J. CASALE, in his official capacity as Commissioner of the State Board of Elections, TODD D. VALENTINE, in his official capacity as Co-Executive Director of the State Board of Elections, ROBERT A. BREHM, in his official capacity as Co-Executive Director of the State Board of Elections, FREDERIC M. UMANE, in his official capacity as President of the New York City Board of Elections, MIGUELINA CAMILO, in her official capacity as Secretary of the New York City Board of Elections, JOSE MIGUEL ARAUJO, in his official capacity as Commissioner of the New York City Board of Elections, GINO A. MARMORATO, in his official capacity as Commissioner of the New York City Board of Elections, MICHAEL MICHEL, in his official capacity as Commissioner of the New York City Board of Elections, RODNEY L. PEPE-SOUVENIR, in her official capacity as Commissioner of the New York City Board of Elections, SIMON SHAMOUN, in his official capacity as Commissioner of the New York City Board of Elections, PATRICIA ANNE TAYLOR, in her official capacity as Commissioner of the New York City Board of Elections, TIFFANY TOWNSEND, in her official capacity as Commissioner of the New York City Board of Elections; JOHN WM. ZACCONE, in his official capacity as

Commissioner of the New York City Board of Elections, (collectively, "Defendants"), and allege as follows:

## INTRODUCTION

1. Extended wait times to vote in person throughout the state of New York have long imposed significant barriers to the franchise. In the 2020 general election, for example, voters in New York City, Albany, Erie, Nassau, and Orange Counties waited in hours-long lines to cast their ballots. Communities with the largest Black, brown, and elderly populations have also faced disproportionately longer wait times than predominately white communities.

2. Plaintiff the Brooklyn Branch of the NAACP is a non-partisan organization committed to removing all barriers of racial discrimination through democratic processes and ensuring the political, educational, social, and economic equality of all citizens. Plaintiff would offer water and other refreshments to voters at polling places, particularly to those voters who face some of the longest lines to vote, but for N.Y. Elec. Law § 17-140 (the "Line Warming Ban" or the "Ban"). The Line Warming Ban needlessly criminalizes the provision of such support, prohibiting Plaintiff and other entities like it from engaging in the protected expressive conduct of celebrating our democracy and the determination of voters willing to wait in long lines to exercise their right to vote.

3. While Plaintiff's claims turn on its protected First Amendment rights, Plaintiff is not the only one suffering under the Line Warming Ban. Varying poll hours, inconsistent distribution of poll sites, and disproportionate voter assignments often result in unbearably long lines to vote. These inconsistencies left poll sites woefully unprepared for the sheer number of voters they had to serve during the 2020 election, as they had in prior statewide elections.

4. In the 2020 general election, for example, long lines grew outside both election day and early voting polling places statewide, pushing wait times to upwards of three and four hours.

The long lines proved too much for Defendant Douglas A. Kellner, co-chair of the New York State Board of Elections (the "State Board"), who put off voting three days in a row once he saw the two-hour lines at his early voting polling place.[1] Those who did brave the lines waited for hours to vote in person, either during early voting or on election day, and were often left hungry, thirsty, or in pain from standing for such long periods of time. Mayor Bill de Blasio complained of back pain after waiting for three hours to vote in his Brooklyn neighborhood.[2]

5. Yet, New York has a state-mandated ban on volunteer efforts to ease voters' discomfort with sundries of water, meals, or snacks. The Ban has long prohibited any form of "line warming" by imposing criminal sanctions on any nonpartisan person or group that offers free food or drink, or anything else of value, to voters waiting in line to vote.

6. The Line Warming Ban imposes a blanket prohibition, making it a misdemeanor to provide most anything to "any other person in connection with or in respect of any election" while they are waiting in line to vote. N.Y. Elec. Law § 17-140. The Ban completely undermines the Brooklyn Branch of the NAACP's expressive conduct in support of our democracy and the voters participating in it through providing such voters free water and other refreshments.

7. The Line Warming Ban imposes an overbroad prohibition that criminalizes the expressive practice of providing vital resources and support to voters waiting in what are often unbearably long lines. If left in effect the Ban will make it harder—and, in some cases, impossible—for the elderly, disabled, minorities, and poorer communities to exercise their right

---

[1] Dana Rubenstein, *Early Voting in New York: 5 Takeaways*, N.Y. Times (Oct. 27, 2020), https://www.nytimes.com/2020/10/27/nyregion/nyc-early-voting-election.html.

[2] Dana Rubenstein, 1.1 Million New Yorkers Voted Early. Lines and Covid Didn't Stop Them, N.Y. Times (Nov. 2, 2020), https://www.nytimes.com/2020/11/02/nyregion/nyc-early-voting.html.

to vote. Plaintiff aims only to lighten that load, in recognition of the burdens faced by New York's in-person voters, by providing free food and drink in an expression of solidarity with voters who brave long lines and the elements to be heard.

8. Because the Ban violates the protected expressive rights of Plaintiff and others like it, it is unconstitutional, and Defendants should be enjoined from enforcing the Ban.

## JURISDICTION AND VENUE

9. Plaintiff brings this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation under color of state law of rights secured by the United States Constitution.

10. This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the matter in controversy arises under the Constitution and the laws of the United States.

11. Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part the events that gave rise to Plaintiff's claim occurred in this judicial district.

12. This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201–2202.

## PARTIES

13. Plaintiff the Brooklyn Branch of the NAACP is a nonpartisan organization that, among other things, focuses on removing barriers to the franchise. The Brooklyn Branch of the NAACP's mission is to is to remove all barriers of racial discrimination through democratic processes, including by assisting and supporting voters forced to wait in exceedingly long lines to vote, especially voters in Black and brown communities that have historically suffered disproportionately longer wait times to vote in New York. The Brooklyn Branch of the NAACP hopes to support voters by offering food, water, and other modest refreshments. The Line Warming

Ban completely undermines Plaintiff's mission and prohibits the type of civic engagement and assistance Plaintiff would provide but for the Ban.

14. Defendants PETER S. KOSINSKI, DOUGLAS A. KELLNER, ANDREW J. SPANO, ANTHONY CASALE, TODD D. VALENTINE, and ROBERT A. BREHM are members of the State Board and sued in their official capacity. The Board is a bipartisan agency vested with the responsibility for administration and enforcement of all laws relating to elections in New York State. N.Y. Elec. Law § 3-102. The Board has authority—alone and through its directors and commissioners—to direct the actions of all local boards of elections, including the New York City Board of Elections. In conducting these wide-ranging responsibilities, the Board assists local election boards and investigates complaints of possible statutory violations. The Board also has the clear authority to independently investigate and enforce criminal violations of the election code, *see* N.Y. Elec. Law § 3-107, including violations of the Line Warming Ban, which are criminal misdemeanors. *See* N.Y. Elec. Law § 17-140.

15. Defendants FREDERIC M. UMANE, MIGUELINA CAMILO, JOSE MIGUEL ARAUJO, GINO A. MARMORATO, MICHAEL MICHEL, RODNEY L. PEPE-SOUVENIR, SIMON SHAMOUN, PATRICIA ANNE TAYLOR, TIFFANY TOWNSEND, and JOHN WM. ZACCONE are members of the New York City Board of Elections (the "City Board") and are sued in their official capacity. The City Board is a bipartisan administrative body of ten commissioners, two from each borough upon recommendation by both political parties and then appointed by the City Council for a term of four years. The City Board is responsible under New York State Election Law for the following, among other things: recruiting, training, and assigning the various Election Day officers to conduct elections, operating poll site locations, and educating voters via the notification and dissemination of election information. Because of its duties to

conduct elections and operate poll sites, the City Board is responsible for enforcing compliance with the Line Warming Ban, along with all other applicable New York Election laws, at its poll sites.

## STATEMENT OF FACTS AND LAW

### I. The Line Warming Ban

16. New York's Line Warming Ban imposes a blanket ban on election day activities. "[D]uring the hours of voting, on a day of a general, special or primary election," no person may provide, pay for, or cause others to provide or pay for, "any meat, drink, tobacco, refreshment or provision" to "any other person in connection with or in respect of any election." N.Y. Elec. Law § 17-140. The only two exceptions under the Ban are: (1) for items provided *to* "official representatives of the board of elections or political parties and committees and persons who are engaged as watchers, party representatives or workers assisting the candidate," or (2) if the "meat, drink, tobacco, refreshment or provision [has] a retail value of less than one dollar" *and* is provided *inside* "a polling place" *and* "without any identification of the person or entity supplying such provisions." *Id.*

17. In other words, New York's Line Warming Ban criminalizes the popular, expressive practice by nonpartisan organizations and other volunteers of sharing refreshments with voters while they wait in line.

18. The Ban further prohibits volunteers from the expressive practice of providing voters with other support needed to ensure they are not forced to choose between their health, comfort, and their right to vote due to long waiting times. For example, the Ban prohibits Plaintiff and other organizations and volunteer groups from providing free COVID-19 masks and small bottles of hand sanitizer to voters waiting in line, or disposable plastic ponchos if voters are left to wait in the rain.

19. Assistance and support from the Brooklyn Branch of the NAACP and similar groups would alleviate some of the aforementioned obstacles and, in doing so, facilitate the voting process for those who would otherwise be most burdened or completely restricted by long lines.

20. One of the most successful ways volunteers support voters, as seen in 2020 and prior elections, is to provide voters who have been waiting in long lines with free food (e.g., bags of potato chips or slices of pizza) and water so they can better endure the wait.

21. These volunteers, like everyone else, are prohibited from and do not engage in electioneering while offering their support. *See* N.Y. Elec. Law § 8-104(1); *see also* N.Y. Elec. Law §§ 17-142, 17-144 (prohibiting providing or receiving consideration in exchange for one's vote); N.Y. Const. art. III, § 3 (same). They simply offer comfort to help voters better endure long lines so that they may successfully cast their ballot.

22. In providing support to voters who suffer long or uncomfortable waits in their commitment to exercising the franchise, these volunteers also engage in expressive conduct on behalf of themselves and their organizations. Namely, the protected expression includes but is not limited to a celebration of our democracy and of the dedicated voters who endure weather and long waits to have their voices heard, as well as the rejection of voter suppression through long lines and wait times that severely burden our most fundamental rights.

23. However, under the Line Warming Ban, anyone offering voters support and thereby engaging in such expression is guilty of a Class A misdemeanor punishable by up to one year in jail or three years' probation and a fine of up to $1000 or twice the amount of the individual's gain from the infraction.

24. The two extremely limited exceptions to the Ban do nothing to mitigate its constitutional defects. Under the first narrow exception, refreshments may be provided, without

limitation, *to* "official representatives of the board of elections or political parties and committees and persons who are engaged as watchers, party representatives or workers assisting the candidate." N.Y. Elec. Law § 17-140. This exception does not apply to voters at all, and therefore the Ban still forecloses any protected expression of solidarity with voters who brave long lines and the elements to be heard through line warming. The second exception, which does allow for the provision of refreshments to voters under a very narrow set of conditions, also fails to allow any expressive conduct through line warming. Under this exception, refreshments and other items may be provided to voters *only* if such provisions: (1) are provided *inside* the polling place; (2) are provided *anonymously*; and (3) have a retail value of less than one dollar. *Id.* Because this exception only applies to the *inside* of a polling place, whereby even anonymously provided refreshments and other provisions valued at less than a dollar cannot be offered to voters who are waiting in line *outside* the polling place, it still fully forecloses the protected expression inherent to *line* warming.

25. But even if that were not the case, the other limitations— which require anonymity and cap the value of any provision at one dollar—would independently make the Ban unconstitutional. First, requiring that the provision be anonymous unnecessarily prohibits nonpartisan organizations, like the Brooklyn Branch of the NAACP, from taking ownership of their expressive conduct. The First Amendment protects the freedom of the speaker "to decide whether or not to disclose his or her true identity," and whether to be anonymous in her expression. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 341 (1995). Requiring anonymity runs afoul of that right. And because line warming does not and cannot involve electioneering, which is already banned within a 100-foot radius of any polling place under New York Law, *see* N.Y. Elec. Law § 8-104(1), and can therefore *only* be undertaken by nonpartisan groups not advocating for

any candidate, party, or measure on the ballot, it is impossible to imagine what compelling or even legitimate purpose the State might have in compelling anonymity. *See People v. Maldonado*, 63 Misc. 3d 716, 720, 97 N.Y.S.3d 408, 412 (N.Y. Dist. Ct. 2019) (explaining that, while New York Election Law does not define "electioneering," it refers to attempts to "influence a voter" and how they will vote). In addition, the arbitrary requirement that any provision under the exception have a "retail value of less than one dollar" also needlessly abridges expressive rights. For example, a small bottle of water has a retail value of $1.54, a bottle of Coca-Cola costs $1.91, and a slice of Costco pizza costs $1.99. Providing any of these modest comforts is prohibited under the Ban. And it strains credulity to imagine what legitimate, let alone compelling, interest the state might have in imposing this arbitrary cap. Since line warming is necessarily nonpartisan, the State cannot justify why, under the Ban, providing a candy bar is acceptable but providing a bottle of water or a slice of pizza is a criminal offense. Nevertheless, because this exception *only* applies to anonymous provisions made *inside* the polling place, the Ban would still be unconstitutional regardless of whether the cap under the exception was $5, $10, or $1,000 dollars, because the Ban prohibits all *line* warming regardless of the value of the provision.

## II. New York Elections' Historically Long Lines

26.     Though 2020 produced unprecedented wait times, long lines have persisted as an issue of concern for Defendants. That year wait times skyrocketed to three and four hours throughout the state as voters turned out in record numbers. This was much more than what voters experienced in years prior and far beyond the mandated maximum of 30 minutes. N.Y. Elec. Law §§ 3-400(9) (requiring that "[t]he board of elections shall assign staff and provide resources to ensure a voter's wait time to vote at an early voting site shall not exceed thirty minutes"); 6210.19(c)(3) (requiring that election equipment be distributed such that "sufficient voting systems

and privacy booths are assigned to ensure voter wait time is less than 30 minutes"); 6210.19(d)(1) (requiring that local "boards shall deploy sufficient voting equipment, election workers and other resources so that voter waiting time at a poll site does not exceed 30 minutes"); 6211.1(b)(2) (requiring the board of elections to ensure compliance with 6210.19(d) when reducing the number of early voting sites below the prescribed levels so that voter wait time does not exceed 30 minutes).

27. Long wait times affect all New Yorkers, but poor and minority voters are disproportionately affected as they routinely wait in lines three to four times longer than voters in more affluent or majority-white communities.[3] Additionally, elderly and disabled voters who are especially susceptible to the hazards of standing for extended periods of time are more severely disadvantaged by the lack of assistance and support. Thus, while poll lines are an inconvenience for some, for others they are exclusionary obstacles.

### III.  The Ban's Impact on Plaintiff's Rights

28. The Brooklyn Branch of the NAACP's mission is to is to remove all barriers of racial discrimination through democratic processes. The Brooklyn Branch of the NAACP advocates for and hopes that New York's excessively long lines to vote will someday be remedied, but until they are, the Brooklyn Branch of the NAACP should be free to engage in activities

---

[3] Kevin Quealy, *Election Day Voting in 2020 Took Longer in America's Poorest Neighborhoods*, N.Y. Times (Jan. 4, 2021), https://www.nytimes.com/interactive/2021/01/04/upshot/ voting-wait-times.html (concluding based on anonymized smart phone data and public databases that, nationwide in the 2020 general election, "[c]asting a vote typically took longer in poorer, less white neighborhoods than it did in whiter and more affluent ones"); *see also* The Black Institute, *Mississippi on the Hudson*, (2018), https://d3n8a8pro7vhmx.cloudfront.net/theblackinstitute/pages/1448/attachments/original/1516814612/Mississippi_on_the_Hudson_%28TBI_Report%29.pdf?1516814612 (demonstrating that wait times as a result of disparate polling place accessibility in New York City disparately impacts communities of color and low income communities).

intended to make the burdensome and difficult experience of waiting in line to vote more bearable, especially for voters in Black and brown communities that have historically suffered disproportionately longer wait times to vote. But for the Ban, the Brooklyn Branch of the NAACP would provide sundries such as bottled water, potato chips, or pizza to voters already waiting in line.

29. The Brooklyn Branch of the NAACP does not intend to bribe, gather, or entice voters to come to the polls or vote a certain way. Nor does it intend to participate in electioneering or other campaign activities while providing voters with free refreshments while they wait in line to cast their ballots.

30. The Brooklyn Branch of the NAACP's only intention is to provide nonpartisan support and assistance to those voters already in line and waiting to cast their ballot.

31. The Brooklyn Branch of the NAACP's efforts are nonpartisan and intended to help *all* voters better endure long lines so that they may successfully cast their ballot, especially voters living in Black and brown communities that have historically suffered disproportionately longer wait times to vote.

32. However, the Line Warming Ban actively works against the Brooklyn Branch of the NAACP's efforts. The Ban exacerbates the obstacles voters face by prohibiting it and similar groups from supporting voters waiting in line. Without support, some voters will almost certainly succumb to the fatigue and discomfort of waiting in line to cast their ballots. As voters give way to the pressures of waiting in line, the integrity and inclusiveness of the electoral process is lessened with the loss of each vote.

33. The threat of prosecution harms organizations like the Brooklyn Branch of the NAACP by proscribing its First Amendment-protected expressive conduct and its right to

participate in the electoral process. More specifically, the Brooklyn Branch of the NAACP and similarly situated organizations are prevented from distributing food and water to voters enduring long lines to vote, which amounts to expressive conduct in solidarity with the tenacity of New York's voters to participate in the franchise.

34. The Line Warming Ban unconstitutionally criminalizes the Brooklyn Branch of the NAACP's protected political expression by making it a misdemeanor to engage in such expression through providing support to voters waiting in the increasingly oppressive lines.

## CLAIMS FOR RELIEF

### COUNT I

**U.S. Const. Amend. I and XIV, 42 U.S.C. §§ 1983, 1988, 28 U.S.C. §§ 2201, 2202
The Line Warming Ban Violates Rights to Freedom of Speech and Expression**

35. Plaintiff realleges and reincorporates by reference paragraphs 1-34 of this Complaint as through fully set forth herein.

36. The First Amendment to the United States Constitution, incorporated to the states through the Fourteenth Amendment, protects the rights of free speech and expression—including "the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Meyer v. Grant*, 486 U.S. 414, 422–23 (1988). Limitations on core political expression are subject to "exacting scrutiny." *Id.* at 420 (citing *Buckley v. Valeo,* 424 U.S. 1, 45 (1976)). This analysis requires a court to consider the ways in which the challenged provision burdens expressive rights against the justification of the statutory prohibition. *See id.* at 421-27.

37. Organizations and individuals, like the Brooklyn Branch of the NAACP, who plan to distribute, or coordinate the distribution of, food and drink to voters waiting in line engage in First Amendment-protected core political speech and expression in support of New York voters' efforts to participate in the franchise. *See Fort Lauderdale Food Not Bombs v. City of Fort*

*Lauderdale*, 901 F.3d 1235, 1241-44 (11th Cir. 2018) (recognizing the food sharing done by plaintiff organization as protected expressive conduct).

38. The Line Warming Ban unconstitutionally criminalizes and burdens such protected speech and expression by making it a misdemeanor for nonpartisan groups and individuals to supply voters with "any meat, drink, tobacco, refreshment or provision," unless it is provided *inside* a polling place, has a value of less than one dollar, and is provided anonymously.

39. Consequently, the Ban imposes a fundamental impediment to Plaintiff's First Amendment right to participate in the political process and engage in core political speech.

40. The Ban serves no election administration goal that justifies the burdens it imposes on Plaintiff's constitutionally protected expressive rights. For example, New York election law already criminalizes electioneering within one hundred feet of polling places. *See* N.Y. Elec. Law §§ 5-204; 8-104, & 17-130. And both the New York Constitution and New York Election Law prohibit vote buying or otherwise bribing voters. N.Y. Const. art. III, § 2; N.Y. Elec. Law §§ 17-142, 17-144. With these restrictions working in tandem, the Ban is unnecessary to maintain the integrity of the electoral process and instead serves only to burden and silence core political speech, while also imposing collateral consequences on voters who cannot be offered (or accept) refreshments while waiting in line to vote.

41. As a result, the Ban unconstitutionally restricts the First Amendment rights of Plaintiff, and the rights of other individuals and entities like Plaintiff, because it burdens core political speech and it is not sufficiently related to any compelling, or even legitimate or important, government interest.

## COUNT II

### Free Speech and Association
### U.S. Const. Amend. I and XIV, 42 U.S.C. §§ 1983, 1988
### The Line Warming Ban is Unconstitutionally Vague and Overbroad

42. Plaintiff realleges and reincorporates by reference paragraphs 1-41 of this Complaint as though fully set forth herein.

43. The Line Warming Ban is unconstitutionally vague and overbroad under the First Amendment and the Due Process Clause of the Fourteenth Amendment.

44. The Line Warming Ban criminalizes sharing "any meat, drink, tobacco, refreshment, or provision" with "any other person in connection with or in respect of any election," unless: (1) the provision is only given to "official representatives of the board of elections or political parties and committees and persons who are engaged as watchers, party representatives or workers assisting the candidate," and not to voters; or (2) the provision is made *inside* a polling place, has a value of less than one dollar, and is provided anonymously. N.Y. Elec. Law § 17-140. Anyone who violates the Ban is guilty of a Class A misdemeanor. *Id.*

45. The Line Warming Ban does not provide sufficient guidance as to the prohibited conduct or prevent arbitrary enforcement. Despite a close reading, the Brooklyn Branch of the NAACP cannot distinguish between what is permissible or impermissible conduct. This is, in part, because the entire statute consists of one run-on sentence, and because the very narrow exceptions to the law require the reader to decipher what amounts to a series of Russian nesting dolls of dependent clauses:

> Any person who directly or indirectly by himself or through any other person in connection with or in respect of any election during the hours of voting on a day of a general, special or primary election gives or provides, or causes to be given or provided, or shall pay, wholly or in part, for any meat, drink, tobacco, refreshment or provision to or for any person, other than persons who are official representatives of the board of elections or political parties and

> committees and persons who are engaged as watchers, party representatives or workers assisting the candidate, except any such meat, drink, tobacco, refreshment or provision having a retail value of less than one dollar, which is given or provided to any person in a polling place without any identification of the person or entity supplying such provisions, is guilty of a Class A misdemeanor.

*Id.* Indeed, the exceptions are so convoluted that they are *almost* incomprehensible. One could easily misread the statute to wrongly assume that the Ban permits provisions to voters waiting in line valued less than a dollar (it does not), or that the Ban permits election officials to provide refreshments or other items of value to voters waiting in line (it does not).

46. Additionally, it is unclear whether the Line Warming Ban prohibits support on early voting days or only on Election Day; and whether its only impermissible to do so during poll hours yet permissible to support voters waiting in line before the polls open and after they close. Lastly, one cannot discern from reading the statute whether it is permissible or impermissible to provide support to voters in lines outside the 100-foot-radius ban imposed on electioneering. As a result, the law likely chills more than it was intended to prohibit, since it is so unclear what might constitute a crime.

47. The lack of clarity makes it impossible for the Brooklyn Branch of the NAACP and similarly situated organizations to conduct themselves so as not to violate the Ban. On the other hand, the Ban is so unclear that it is easily susceptible to inconsistent, arbitrary, and capricious enforcement.

48. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The Supreme Court has long recognized that laws must give the "person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly" and "must provide explicit standards for those who apply them." *Id.* Vague statutes are especially egregious

when they "abut upon sensitive areas of basic First Amendment freedoms." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964).

49. The "Constitution demands a high level of clarity from a law if it threatens to inhibit the exercise of a constitutionally protected right, such as the right of free speech." *Konikov v. Orange County*, 410 F.3d 1317, 1329 (11th Cir. 2005) (citing *Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982)). The Line Warming Ban lacks any clarity and will work to "trap the innocent by failing to give fair notice of what is prohibited." *Id.*

50. The Line Warming Ban is therefore unconstitutionally vague and overbroad under the Due Process Clause and the First Amendment to the U.S. Constitution.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment:

A. Declaring the Line Warming Ban violates the First Amendment right to free speech and expression;

B. Declaring the Line Warming Ban violates the First and Fourteenth Amendments to the U.S. Constitution as impermissibly vague and overbroad;

C. Enjoining Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them from enforcing the Line Warming Ban;

D. Awarding Plaintiff its costs, expenses, and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and other applicable laws; and

E. Granting such other and further relief as the Court deems just and proper.

Dated: September 14, 2021 Respectfully submitted,

By: /s/ Adam H. Schuman
    Adam H. Schuman
    PERKINS COIE LLP
    1155 Avenue of the Americas
    New York, NY 11036-2711
    Tel: 212.261.6919
    Fax: 212.977.1649
    ASchuman@perkinscoie.com

    Abha Khanna*
    ELIAS LAW GROUP LLP
    1700 Seventh Avenue, Suite 2100
    Seattle, WA 98101
    Tel: 206.656.0177
    Fax: 202.968.4498
    AKhanna@elias.law

    Alexi M. Velez*
    Jyoti Jasrasaria*
    Meaghan Elysia Mixon*
    ELIAS LAW GROUP LLP
    10 G Street NE, Suite 600
    Washington, DC 20002
    Tel: 202.968.4490
    Fax: 202.968.4498
    AVelez@elias.law
    JJasrasaria@elias.law
    MMixon@elias.law

    * Motions for admission *pro hac vice* forthcoming