UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

THE BROOKLYN BRANCH OF THE NATIONAL
ASSOCIATION FOR THE ADVANCEMENT OF
COLORED PEOPLE,

                Plaintiff,

              -v.-

PETER S. KOSINSKI, *in his official capacity as Co-Chair of the State Board of Elections*; DOUGLAS A. KELLNER, *in his official capacity as Co-Chair of the State Board of Elections*; ANTHONY J. CASALE, *in his official capacity as Commissioner of the State Board of Elections*; KRISTEN ZEBROWSKI STAVISKY, *in her official capacity as Co-Executive Director of the State Board of Elections*; SIMON SHAMOUN, *in his official capacity as Commissioner of the New York City Board of Elections*; RODNEY L. PEPE-SOUVENIR, *in her official capacity as Commissioner of the New York City Board of Elections*; JOSE MIGUEL ARAUJO, *in his official capacity as Commissioner of the New York City Board of Elections*; MICHAEL J. COPPOTELLI, *in his official capacity as Commissioner of the New York City Board of Elections*; GINO A. MARMORATO, *in his official capacity as Commissioner of the New York City Board of Elections*; JODI MORALES, *in her official capacity as Commissioner of the New York City Board of Elections*; KEITH SULLIVAN, *in his official capacity as Commissioner of the New York City Board of Elections*; PATRICIA ANNE TAYLOR, *in her official capacity as Commissioner of the New York City Board of Elections*; and FREDERIC M. UMANE, *in his official capacity as President of the New York City Board of Elections*;

              Defendants.[1]

21 Civ. 7667 (KPF)

**OPINION AND ORDER**

---

[1]    The Clerk of Court is directed to amend the caption to conform to the caption set forth above.

KATHERINE POLK FAILLA, District Judge:

The right to vote is among the most fundamental of the rights secured to Americans by our Constitution.  It is one of the only methods by which We the People can directly participate in our democracy; it is "preservative of other basic civil and political rights[.]"  *Reynolds* v. *Sims*, 377 U.S. 533, 562 (1964); *see also* Martin Luther King Jr., Give Us the Ballot Address, Prayer Pilgrimage for Freedom (May 17, 1957) ("Give us the ballot, and we will no longer have to worry the federal government about our basic rights ....  [W]e will by the power of our vote write the law on the statute books of the South and bring an end to the dastardly acts of the hooded perpetrators of violence.").

Perceiving the hours-long voting lines in New York's 2020 general election as a threat to the free exercise of this most precious right, the Brooklyn Branch of the National Association for the Advancement of Colored People ("Plaintiff") determined to protest voter suppression and to encourage voters to endure lengthy delays by offering food and drinks to people waiting in line to vote.  This practice, colloquially known as "line warming," is a misdemeanor in New York.  In this suit, Plaintiff challenges that criminal statute as violative of its and its members' rights under the First and Fourteenth Amendments. Defendants have moved to dismiss Plaintiff's operative complaint on a variety of grounds.  For the reasons that follow, Plaintiffs' constitutional claims can proceed to discovery.

**BACKGROUND**[2]

## A.     Factual Background

### 1.     New York's Line Warming Ban and Its Administration

It has long been a crime in New York State to provide food, drink, or other sundries to individuals waiting in line to vote.  (*See* AC ¶ 5).  The current iteration of this restriction is Section 17-140 of the New York Election Code ("Section 17-140" or the "Line Warming Ban"), which is titled "Furnishing money or entertainment to induce attendance at polls."  In full, Section 17-140 provides:

> Any person who directly or indirectly by himself or through any other person in connection with or in respect of any election during the hours of voting on a day of a general, special or primary election gives or provides, or causes to be given or provided, or shall pay, wholly or in part, for any meat, drink, tobacco, refreshment or provision to or for any person, other than persons who are official representatives of the board of elections or political parties and committees and persons who are engaged as watchers, party representatives or workers assisting the candidate, except any such meat, drink, tobacco, refreshment or provision having a retail value of less than one dollar, which is given or provided to any person in a polling place without any identification of the person or entity supplying such provisions, is guilty of a Class A misdemeanor.

---

[2]     This Opinion draws its facts from the Amended Complaint (Dkt. #38 (the "AC")), the well-pleaded allegations of which are taken as true for the purposes of this Opinion.

For ease of reference, the Court refers to the State Defendants' memorandum of law in support of their motion to dismiss as "Def. Br." (Dkt. #41); to Plaintiff's memorandum of law in opposition to Defendants' motion as "Pl. Opp." (Dkt. #44); and to the State Defendants' reply in further support of their motion as "Def. Reply" (Dkt. #45).  Because the City Defendants joined the State Defendants' motion to dismiss in full and did not raise any independent arguments in support of dismissal (Dkt. #43), the Court does not separately refer to the City Defendants' filings.

N.Y. Elec. Law § 17-140.  In New York, Class A misdemeanors are punishable by up to one year's imprisonment or up to three years' probation and a monetary fine.  (AC ¶ 23).

The New York State Board of Elections (the "State Board") is a bipartisan agency responsible for enforcing New York's election laws, including the Line Warming Ban.  (AC ¶ 14).  *See also* N.Y. Elec. Law §§ 3-102, 107.  Defendants Peter S. Kosinski, Douglas A. Kellner, Andrew J. Spano, Anthony Casale, and Kristen Zebrowski Stavisky (the "State Defendants") are members of the State Board and are sued in their official capacities.  (AC ¶ 14).[3]

The New York City Board of Elections (the "City Board") is a bipartisan administrative body composed of commissioners who serve four-year terms. (AC ¶ 15).  New York law tasks the City Board with administering elections and operating poll sites within New York City.  (*Id.*).  The City Board is responsible for enforcing election laws, including the Line Warming Ban, at the polling sites it manages.  (*Id.*).  Defendants Simon Shamoun, Rodney L. Pepe-Souvenir, Jose Miguel Araujo, Michael J. Coppotelli, Gino A. Marmorato, Jodi Morales, Keith Sullivan, Patricia Anne Taylor, Frederic M. Umane (the "City Defendants" and,

---

[3]     When a public officer sued in their official capacity ceases to hold office while an action is pending, the officer's successor is automatically substituted as a party.  Fed. R. Civ. P. 25(d).  In the months since this lawsuit was filed, Defendants Todd D. Valentine and Robert A. Brehm left their roles on the State Board and Kristen Zebrowski Stavisky joined the State Board.  The Clerk of Court is directed to substitute Ms. Stavisky as defendant in place of Mr. Valentine and Mr. Brehm.

collectively with the State Defendants, "Defendants"), are members of the City Board and are sued in their official capacities. (*Id.*).[4]

### 2.   New York's Voting Lines

New York law seeks to ensure that voters do not wait more than thirty minutes to cast their ballots. (AC ¶ 26 (citing N.Y. Elec. Law §§ 3-400(9), 6210.19(c)(3), 6210.19(d)(1), 6211.1(b)(2))). Despite these regulations, many New York voters had to endure long lines to vote in the 2020 general election. (*Id.* ¶¶ 4, 26). Early voters and election-day voters alike had to wait in voting lines for "upwards of three and four hours." (*Id.* ¶ 4). Long wait times disproportionately affect poor and minority voters, who routinely must wait three to four times longer to vote than voters in affluent and majority-white communities. (*Id.* ¶ 27). Long lines also pose a disproportionate challenge to elderly and disabled voters, who may have physical limitations that make standing in line for extended periods difficult. (*Id.*).

### 3.   Plaintiff's Mission and Activities

Plaintiff is a nonpartisan organization dedicated to "remov[ing] all barriers of racial discrimination through democratic processes, educat[ing] voters on their constitutional rights, and tak[ing] all lawful action to secure the exercise of those rights." (AC ¶¶ 13, 29). For more than a century, Plaintiff has

---

[4]     In the months since this lawsuit was filed, Defendants Miguelina Camilo, Michael Michel, Tiffany Townsend, and John Wm. Zaccone left their roles on the City Board and Michael J. Coppotelli, Jodi Morales, and Keith Sullivan joined the City Board. The Clerk of Court is directed to substitute Mr. Coppotelli, Ms. Morales, and Mr. Sullivan as defendants in place of Ms. Camilo, Mr. Michel, Ms. Townsend, and Mr. Zaccone. *See* Fed. R. Civ. P. 25(d).

engaged in "voter outreach, education, and activism" to improve access to the franchise, including hosting get-out-the-vote rallies at which it "provides food, refreshments, and entertainment to convey its message of support for voters." (*Id.* ¶ 29).  Plaintiff has concentrated its voter education efforts on New York elections in the past; for instance, it hosted virtual information sessions and candidate forums in the lead-up to the 2021 New York City primary election. (*Id.*).

Excessively long voting lines are contrary to Plaintiff's mission of expanding the franchise, so Plaintiff "advocates for and hopes that" New York's long voting lines will someday be reduced.  (AC ¶ 30; *see also id.* ¶ 34 ("Supporting voters braving long lines on election day is central to [Plaintiff's] mission[.]")).  But so long as long lines are a reality, Plaintiff endeavors to support voters by "mak[ing] the burdensome and difficult experience of waiting in line to vote more bearable, especially for voters in Black and brown communities that have historically suffered disproportionately longer wait times to vote."  (*Id* ¶ 30).  To that end, it has "set aside resources and plans to provide nonpartisan support and assistance to those voters already in line and waiting to cast their ballot to convey the importance of them staying in line, the importance of voting, and emphasizing that everyone's vote counts."  (*Id.* ¶ 32). If not for the Line Warming Ban, Plaintiff and its members and volunteers "would provide sundries such as bottled water, donuts, potato chips, or pizza to voters already waiting in line."  (*Id.* ¶ 30).  These efforts would be nonpartisan; Plaintiff does not intend to participate in any partisan activities,

including electioneering or other forms of campaigning, while providing this support.  (*Id.* ¶¶ 31, 32).

**B.    Procedural Background**

Plaintiff initiated this action by filing a Complaint on September 14, 2021.  (Dkt. #1).  With Plaintiff's consent, the State Defendants requested an extension of the answer deadline to November 14, 2021 (Dkt. #10), which request the Court granted (Dkt. #11).  Shortly thereafter, the Court granted the City Defendants' request for their answer to also be due on November 14, 2021. (Dkt. #13-14).  The Court adjourned the answer deadline for a second time to accommodate the parties' efforts to resolve this matter without further litigation.  (Dkt. #25).

On January 14, 2022, the State Defendants filed a letter detailing the grounds for their contemplated motion to dismiss and requesting a conference to discuss this motion.  (Dkt. #28).  That same day, the City Defendants joined the State Defendants' conference request and stated their intent to file a motion to dismiss on the same grounds.  (Dkt. #29).  Plaintiff filed a letter outlining its opposition to the intended motions on January 20, 2022.  (Dkt. #30).  The Court dispensed with its usual requirement of a pre-motion conference and set a briefing schedule for the contemplated motions to dismiss.  (Dkt. #31).  Pursuant to that schedule, Defendants filed their motions to dismiss and accompanying papers on March 1, 2022.  (Dkt. #32-34).

On March 22, 2022, Plaintiff filed the Amended Complaint (or "AC") as of right under Federal Rule of Civil Procedure 15(a)(1)(B).  (Dkt. #38).  The AC

alleges that the Line Warming Ban violates the First and Fourteenth
Amendments to the U.S. Constitution because it (i) burdens the right of
Plaintiff and its members to freedom of expression, (ii) is overly broad on its
face, and (iii) is not sufficiently clear as to what conduct it prohibits. (AC
¶¶ 38-64). Plaintiff seeks a declaration that the Line Warming Ban is
unconstitutional, an injunction preventing enforcement of the Line Warming
Ban, and an award of costs and attorneys' fees. (*Id.* at 18 (Prayer for Relief)).

The parties agreed that Plaintiff's filing of the AC mooted the pending
motions to dismiss and proposed a schedule for Defendants to renew their
motions. (Dkt. #39). The Court adopted the parties' proposed briefing
schedule. (Dkt. #40). Pursuant to that schedule, the State Defendants filed a
motion to dismiss the AC on April 26, 2022. (Dkt. #41). Also on April 26,
2022, the City Defendants filed a notice of motion to dismiss (Dkt. #42) and a
declaration adopting the State Defendants' arguments in full (Dkt. #43).
Plaintiff filed its opposition to the motions on May 24, 2022 (Dkt. #44), and the
State Defendants filed a reply in further support of their motion on June 7,
2022 (Dkt. #45). The Court now considers those motions.

## DISCUSSION

**A.    The Court Denies Defendants' Motions to Dismiss for Lack of
Subject Matter Jurisdiction**

### 1.    Motions to Dismiss Under Federal Rule of Civil Procedure
12(b)(1)

Defendants claim that Plaintiff lacks standing to pursue its claims, and
that this Court must therefore dismiss the action pursuant to Federal Rule of

Civil Procedure 12(b)(1).  (*See* Def. Br. 7-14).  Rule 12(b)(1) permits a party to move to dismiss a complaint for "lack of subject-matter jurisdiction."  Fed. R. Civ. P. 12(b)(1).  "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."  *Makarova* v. *United States,* 201 F.3d 110, 113 (2d Cir. 2000).  A defendant may move to dismiss a case for lack of subject matter jurisdiction based on a plaintiff's lack of Article III standing. *See Carter* v. *HealthPort Techs., LLC*, 822 F.3d 47, 54-55 (2d Cir. 2016).

Challenges to subject matter jurisdiction under Rule 12(b)(1) can be either facial or fact-based.  *Carter,* 822 F.3d at 56-57; *see also Katz* v. *Donna Karan Co., L.L.C.*, 872 F.3d 114, 119 (2d Cir. 2017).  A facial Rule 12(b)(1) motion is one "based solely on the allegations of the complaint or the complaint and exhibits attached to it."  *Carter*, 822 F.3d at 56.  A plaintiff opposing such a motion bears "no evidentiary burden," *id.*, and the court's task is to determine whether the complaint and its exhibits allege facts that "affirmatively and plausibly suggest" that the plaintiff has standing to sue, *Amidax Trading Grp.* v. *S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011) (per curiam).  In making that determination, the court must accept the complaint's allegations as true "and draw[] all reasonable inferences in favor of the plaintiff."  *Carter*, 822 F.3d at 57 (internal quotation marks and citation omitted).

"Alternatively, a defendant is permitted to make a fact-based Rule 12(b)(1) motion, proffering evidence beyond the complaint and its exhibits." *Carter*, 822 F.3d at 57; *see also MMA Consultants 1, Inc.* v. *Rep. of Peru*, 719 F.

App'x 47, 49 (2d Cir. 2017) (summary order) (defining fact-based Rule 12(b)(1) motion as one where "the defendant puts forward evidence to challenge the factual contentions underlying the plaintiff's assertion of subject-matter jurisdiction"). "In opposition to such a motion, [the plaintiff] must come forward with evidence of their own to controvert that presented by the defendant, or may instead rely on the allegations in the[ir p]leading if the evidence proffered by the defendant is immaterial because it does not contradict plausible allegations that are themselves sufficient to show standing." *Katz*, 872 F.3d at 119 (internal citations and quotations omitted). If a defendant supports its fact-based Rule 12(b)(1) motion with "material and controverted" "extrinsic evidence," a "district court will need to make findings of fact in aid of its decision as to subject matter jurisdiction." *Carter*, 822 F.3d at 57.

### 2. Plaintiff Adequately Alleges an Imminent Injury-In-Fact

Federal courts have limited jurisdiction, "and lack the power to disregard such limits as have been imposed by the Constitution or Congress." *Platinum-Montaur Life Scis., LLC* v. *Navidea Biopharms., Inc.*, 943 F.3d 613, 616 (2d Cir. 2019) (internal quotation marks and citation omitted). Article III of the Constitution "limits the jurisdiction of federal courts to 'Cases' and 'Controversies,'" thereby "restrict[ing] the authority of federal courts to resolving 'the legal rights of litigants in actual controversies[.]'" *Genesis Healthcare Corp.* v. *Symczyk*, 569 U.S. 66, 71 (2013) (quoting *Valley Forge Christian Coll.* v. *Ams. United for Separation of Church & State, Inc.*, 454 U.S.

464, 471 (1982)).  The "Case" or "Controversy" requirement means that only

those disputes that meet the "irreducible constitutional minimum" of standing

can be heard in a federal forum.  *Lujan* v. *Defs. of Wildlife*, 504 U.S. 555, 560

(1992); *see also Warth* v. *Seldin*, 422 U.S. 490, 498 (1975) (explaining that

standing is a "threshold question in every federal case, determining the power

of the court to entertain the suit").  To establish standing, a federal plaintiff

must prove three elements:

> First, the plaintiff must have suffered an injury in
> fact — an invasion of a legally protected interest which
> is (a) concrete and particularized; and (b) actual or
> imminent, not conjectural or hypothetical.  Second,
> there must be a causal connection between the injury
> and the conduct complained of ....  Third, it must be
> likely, as opposed to merely speculative, that the injury
> will be redressed by a favorable decision.

*Lujan*, 504 U.S. at 560-61 (citations and internal quotation marks omitted); *see*

*also Already, LLC* v. *Nike, Inc.*, 568 U.S. 85, 90 (2013) (explaining that standing

requires a "personal injury fairly traceable to the defendant's allegedly unlawful

conduct and likely to be redressed by the requested relief" (internal citation and

quotation marks omitted)).

There are two methods by which organizational plaintiffs can establish

standing to sue.  First, an organization may sue on its own behalf.  *Havens*

*Realty Corp.* v. *Coleman,* 455 U.S. 363, 379 n.19 (1982).  To do so, it "must

independently satisfy the requirements of Article III standing."  *Knife Rights,*

*Inc.* v. *Vance*, 802 F.3d 377, 388 (2d Cir. 2015).  In other words, an

organization may seek judicial redress for its own injury.  *N.Y. C.L. Union* v.

11

*N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012) (citing *Warth*, 422 U.S. at 511). Alternatively, an organization may bring suit on behalf of its members, so long as it can show that a particular member would otherwise have standing to sue in his or her own right. *Faculty* v. *N.Y. Univ.*, 11 F.4th 68, 75 (2d Cir. 2021); *see also N.Y. C.L. Union*, 684 F.3d at 294 (calling this approach "representational" or "associational" standing). In this case, Plaintiff sues both on behalf of its members and to vindicate its rights as an entity with goals and projects of its own. (Pl. Opp. 7-8 & 8 n.2).

Defendants challenge only the injury-in-fact component of standing. (*See* Def. Br. 9). To establish an injury in fact, a plaintiff "must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc.* v. *Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560). Moreover, "[t]o establish standing to obtain prospective relief, a plaintiff 'must show a likelihood that he will be injured in the future.'" *Carver* v. *City of New York*, 621 F.3d 221, 228 (2d Cir. 2010) (quoting *Shain* v. *Ellison*, 356 F.3d 211, 215 (2d Cir. 2004)). To establish standing based on future injury, the plaintiff must face a "substantial risk" of injury, or the threat of injury must be "certainly impending." *Susan B. Anthony List* v. *Driehaus*, 573 U.S. 149, 158 (2014). "[A]llegations of *possible* future injury are not sufficient" to establish an injury in fact, *Clapper* v. *Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal citation omitted), nor is past exposure to illegal conduct without more, *City of Los Angeles* v. *Lyons*, 461 U.S. 95, 102 (1983).

12

In Defendants' view, any injury to Plaintiff or its members is speculative because Plaintiff has not engaged in line-warming activity in the past, has not shown that New York has ever enforced the Line Warming Ban in the past, and has not established that the Line Warming Ban will impair its activities.  (Def. Br. 9-14).  Plaintiff counters that it plausibly alleged both the intent of it and its members to engage in activity prohibited by the Ban and a credible threat that it will be prosecuted thereunder.  (Pl. Opp. 7-13).  Plaintiff has the better of the argument.

The heart of Defendants' argument is that Plaintiff's injury is not sufficiently imminent to warrant standing.  Generally, courts are loath to find standing based on fear of a future injury alone.  *Roe* v. *City of New York*, 151 F. Supp. 2d 495, 505 (S.D.N.Y. 2001).  But in certain circumstances, including when a plaintiff anticipates being prosecuted under an unconstitutional law, a risk of enforcement can be a sufficiently concrete harm to support standing. *See Cayuga Nation* v. *Tanner*, 824 F.3d 321, 331 (2d Cir. 2016) ("Preenforcement challenges to criminal statutes … are cognizable under Article III.").  When a party "seeks review of a prohibition prior to its being enforced, 'somewhat relaxed standing' rules apply."  *Centro De La Comunidad Hispana de Locust Valley* v. *Town of Oyster Bay*, 868 F.3d 104, 110-11 (2d Cir. 2017) (quoting *Nat'l Org. for Marriage, Inc.* v. *Walsh*, 714 F.3d 682, 689 (2d Cir. 2013)).

*Babbitt* v. *United Farm Workers National Union* established the test for imminent injury in the context of pre-enforcement challenges, explaining that

plaintiffs can establish injury through a plausible allegation of their "intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, [for which] there exists a credible threat of prosecution thereunder."  442 U.S. 289, 298 (1979); *see also Susan B. Anthony List*, 573 U.S. at 159.

The Court begins by addressing the first two of the *Babbitt* conditions: whether Plaintiff adequately pleaded its intention to engage in conduct violative of the Line Warming Ban.  A future injury is not cognizable if "uncertain future action would need to occur before the plaintiff[] could arguably suffer the harm alleged."  *N.Y. Univ.*, 11 F.4th at 77; *see also Clapper*, 568 U.S. at 414 (finding no standing where injury depended on a "speculative chain of possibilities").  It is not enough for plaintiffs to plead a vague intention to expose themselves to harm at an indeterminate time.  *Lujan*, 504 U.S. at 564 ("'[S]ome day' intentions — without any description of concrete plans, or indeed even any specification of *when* the some day will be — do not support a finding of the 'actual or imminent' injury that our cases require." (emphasis in original)).  Instead, plaintiffs must describe their likely future injuries with specificity.

Plaintiff has met this burden.  The Amended Complaint makes clear that Plaintiff and its members intend to violate the Line Warming Ban by providing food and drinks to voters.  It provides details about the nature of Plaintiff's intended conduct: Plaintiff and its members intend to distribute "sundries such as bottled water, potato chips, or pizza" valued at more than one dollar to individuals waiting in line to vote in New York elections.  (AC ¶ 30).  It also

14

makes clear when and where Plaintiff plans to engage in this prohibited conduct: at polling places in New York during voting hours.  (*Id.* ¶¶ 30, 32). Though not enough to establish injury-in-fact on their own, Plaintiff's allegations that it "has set aside resources" to fund its line warming efforts (*id.* ¶ 32),[5] and has provided food and drink in conjunction with prior efforts to promote voting (*id.* ¶ 29), lend further support to its claimed intention to engage in prohibited line warming.  Through these allegations, Plaintiff has stated more than a "purely hypothetical" injury.  (*See* Def. Br. 10).

The current pleadings are a far cry from allegations of speculative injuries that courts have found insufficient to support standing.  Unlike the plaintiffs in the canonical standing case of *Summers* v. *Earth Island Institute*, 555 U.S. 488 (2009), Plaintiff provides detail on when and where its injury would occur.  *See Summers*, 555 U.S. at 495 (determining that environmental organization did not have standing to challenge timber regulations based on member's plans to visit unspecified national forests on an indeterminate future date).  And unlike the plaintiffs in *Faculty* v. *New York University*, 11 F.4th 68

---

[5]   Contrary to Defendants' assertion, Plaintiff need not "allege to have diverted resources from its core activities as a result of the [Line Warming Ban]."  (*See* Def. Br. 13). Plaintiff's alleged injury is that the Line Warming Ban prevents it from engaging in protected expression, not that the Line Warming Ban injured it economically.  (Pl. Opp. 8 n.2).  Chilling protected speech is undoubtably a cognizable injury.  *Roe* v. *City of New York*, 151 F. Supp. 2d 495, 503 (S.D.N.Y. 2001) ("[I]n the First Amendment context, … a threat of police action that chills the exercise of protected speech may confer standing to sue.").  The Court notes, however, that Plaintiff's burden under an economic impairment theory is low and would likely be satisfied by the allegations in the AC.  After all, "[o]nly a perceptible impairment of an organization's activities is necessary for there to be an injury in fact[.]" *Nnebe* v. *Daus,* 644 F.3d 147, 156-57 (2d Cir. 2011), *revised* (May 31, 2011); *see also Centro De La Comunidad Hispana de Locust Valley* v. *Town of Oyster Bay*, 868 F.3d 104, 110-11 (2d Cir. 2017) (determining that an organization has standing to challenge a law that "perceptibly impair[s]" its activities).

(2d Cir. 2021), Plaintiff's injury does not depend on a "highly attenuated chain of possibilities." *See N.Y. Univ.*, 11 F.4th at 76-77 (determining that plaintiff scholars lacked standing to challenge academic journal's affirmative action policy because they failed to allege concrete plans to apply for employment or submit articles for publication, prerequisites for being discriminated against in those pursuits). Plaintiff — an organization with a vested interest in voting rights and a history of engaging in get-out-the-vote efforts — would run afoul of the Line Warming Ban simply by executing on its credibly stated plans.

Because Plaintiff's plans to violate the Line Warming Ban are sufficiently imminent, its standing turns on the last of the *Babbitt* conditions: whether there is a credible threat that Plaintiff will be prosecuted for its line warming activities. *See Babbitt*, 442 U.S. at 298. The credibility of a threat of prosecution "necessarily depends on the particular circumstances at issue." *Knife Rights*, 802 F.3d at 384. Critically, "imminence does 'not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat — for example, the constitutionality of a law threatened to be enforced.'" *Id.* (quoting *MedImmune, Inc.* v. *Genentech, Inc.,* 549 U.S. 118, 128-29 (2007) (collecting cases)). This doctrine recognizes that would-be plaintiffs "should not be required to await and undergo a criminal prosecution" prior to seeking relief. *Babbitt*, 442 U.S. at 298 (internal quotation marks and citation omitted); *see also N.H. Right to Life Pol. Action Comm.* v. *Gardner,* 99 F.3d 8, 13-14 (1st Cir. 1996) ("[I]t is not necessary that a person expose herself to arrest or prosecution under a statute in order to challenge that statute in a federal

16

court."); *Roe*, 151 F. Supp. 2d at 503 ("[T]here is no per se rule requiring more than one past act, or any prior act, for that matter, as a basis for finding a likelihood of future injury.").  "The rationale that underlies this rule is straightforward: a credible threat of present or future prosecution itself works an injury that is sufficient to confer standing, even if there is no history of past enforcement."  *N.H. Right to Life,* 99 F.3d at 13.

The inquiry does not end there, however.  Defendants correctly point out that a plaintiff's fear of prosecution may be too speculative to support standing if the challenged law is "moribund or of purely historical curiosity."  (Def. Br. 13-14 (quoting *Johnson* v. *District of Columbia*, 71 F. Supp. 3d 155, 159-60 (D.D.C. 2014)).  But in making this determination, courts are "quite forgiving" to plaintiffs seeking pre-enforcement review and are "willing to presume that the government will enforce the law … in the absence of a disavowal by the government or another reason to conclude that no such intent existed." *Hedges* v. *Obama*, 724 F.3d 170, 197 (2d Cir. 2013); *see also Holder* v. *Humanitarian Law Proj.*, 561 U.S. 1, 16 (2010) (emphasizing that "the Government has not argued … that plaintiffs will not be prosecuted if they do what they say they wish to do" in analysis of pre-enforcement standing).  The moribund statute exception is narrow for good reason: A statute may become moribund (and thus insulated from pre-enforcement challenges) for the simple reason that no one is willing to risk prosecution by violating it.  Courts are thus appropriately weary of requiring plaintiffs to commit criminal acts in order

to obtain standing, even where a law has been relegated to a place of low law enforcement priority.

Defendants have not overcome the presumption that New York will enforce the Line Warming Ban against Plaintiff.  Admittedly, the threat of prosecution against Plaintiff is not as strong as it would have been had the state actually threatened it with prosecution.  *See, e.g.*, *Cayuga Nation*, 824 F.3d at 331 (finding a credible threat of prosecution in part because village had "announced its intention to enforce" challenged ordinance against plaintiffs); *Knife Rights*, 802 F.3d at 385 (finding fear of prosecution "hardly conjectural or hypothetical, given that [defendant] recently identified [plaintiff] as a ... violator and pursued enforcement action against it").  But Plaintiff has had little opportunity to test the waters; line warming has been unlawful in New York for decades, while the problem of lengthy voting lines did not come to a head in New York until 2020's "unprecedented" delays.  (AC ¶ 26).

Courts routinely allow pre-enforcement challenges to rarely-invoked statutes like the Line Warming Ban.  In fact, *Babbitt* itself found standing to challenge a statute that had never been enforced.  The plaintiffs in that case brought a First Amendment challenge to an Arizona law prohibiting certain deceptive statements in consumer campaigns.  *Babbitt*, 442 U.S. at 301.  The Supreme Court found the matter justiciable even though the statute's criminal provision "ha[d] not yet been applied and may never be applied to commissions of unfair labor practices[.]"  *Id.* at 302.  Because "the State ha[d] not disavowed any intention of invoking the criminal penalty provision," the Court reasoned,

18

the plaintiffs' fear of prosecution was "not without some reason[.]"  *Id.*  So too here, the authorities tasked with enforcing the Line Warming Ban have not indicated — through explicit statements or otherwise — that Plaintiff and its members are immune from prosecution.  Nor have Defendants indicated that people openly and notoriously violate the Line Warming Ban in the present day without prosecution.  *Cf. Poe* v. *Ullman*, 367 U.S. 497, 501-02 (1961) (finding prosecution unlikely because no prosecutions under state's ban on contraceptive sales were recorded in 75+ years despite "ubiquitous, open, public sales" that "invite the attention of enforcement officials").  Though the facts of *Poe* are distinct from those here, that decision illustrates the danger of failing to entertain pre-enforcement challenges; the appellants in *Griswold* v. *Connecticut*, 381 U.S. 479 (1965), were prosecuted under the very law challenged in *Poe* just a few years after the Court found Poe's risk of prosecution incredible based on a lack of historical prosecutions.  In short, Defendants' failure to find "a single court decision involving a prosecution for a violation of the [Line Warming Ban]" (*see* Def. Br. 14), without more, does not render Plaintiff's fear of prosecution implausible.

Plaintiff has adequately alleged an injury-in-fact that satisfies Article III's imminence requirement.  It pleads with specificity that it and its members intend to engage in conduct proscribed by the Line Warming Ban.  And although it is not certain that Plaintiff or its members will be prosecuted for violating the Line Warming Ban, Plaintiff has established a credible threat of

such enforcement.  The Court is satisfied that it may consider the merits of this case.

**B.      The Court Grants in Part and Denies in Part Defendants' Motions to Dismiss for Failure to State a Claim**

   **1.     Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)**

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).  In considering a Rule 12(b)(6) motion, courts must accept as true all well-pleaded factual allegations in the operative complaint.  *Id.*  Additionally, the Court may consider any written instrument attached to the complaint as an exhibit, any statements or documents incorporated by reference in the complaint, documents that are "integral" to the complaint even if they are not incorporated by reference, and matters of which judicial notice may be taken. *See Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002); *see generally Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (discussing materials that may properly be considered in resolving a motion brought under Fed. R. Civ. P. 12(b)(6)).

2.   **Plaintiff States a Claim That the Line Warming Ban Impermissibly Restricts Expression Protected by the First Amendment**

The First Amendment provides in relevant part that "Congress shall make no law ... abridging the freedom of speech[.]" U.S. Const. amend. I.  It is incorporated against the states through the Due Process Clause of the Fourteenth Amendment.  *Gitlow* v. *New York*, 268 U.S. 652, 666 (1925).  Plaintiff's first cause of action contends that line warming is expressive conduct entitled to protection under the First Amendment and that the Line Warming Ban impermissibly denies it such protection.  (AC ¶¶ 38-44).  Defendants disagree and move to dismiss that cause of action for failure to state a claim. (Def. Br. 14-21).

"[I]t is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies." *Clark* v. *Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984).  But at the pleading stage, the party invoking the First Amendment need only plead facts that, if substantiated, would establish the opposing party's liability. *Iqbal*, 556 U.S. at 678.[6]  Because Plaintiff has met that burden, the Court denies Defendants' motions to dismiss Plaintiff's expressive conduct claim.

---

[6]   Defendants quote *Jones* v. *Schneiderman*, 974 F. Supp. 2d 322, 333 (S.D.N.Y. 2013), for the proposition that to survive a motion to dismiss, the party invoking the First Amendment "must advance more than a mere 'plausible contention' that its conduct is expressive." (Def. Br. 15).  *Schneiderman* appears to have applied this standard to the motion to dismiss context in error.  The cases *Schneiderman* cites for this proposition — *Church of American Knights of the Ku Klux Klan* v. *Kerik,* 356 F.3d 197 (2d Cir. 2004), and *Clark* v. *Community for Creative Non-Violence,* 468 U.S. 288 (1984) — are both summary judgment opinions.  The usual Rule 8 pleading standard is not heightened in the First Amendment context.

### a. Plaintiff Adequately Alleges That the Line Warming Ban Regulates Expressive Conduct

The Constitution's protection for freedom of speech "does not end at the spoken or written word." *Texas* v. *Johnson*, 491 U.S. 397, 404 (1989).  Indeed, the First Amendment protects symbolic or expressive conduct as well as actual speech.  *Church of Am. Knights of the Ku Klux Klan* v. *Kerik*, 356 F.3d 197, 205 (2d Cir. 2004).  To that end, courts have found that activities as varied as wearing an armband to protest war, *Tinker* v. *Des Moines Indep. Cmty. Sch. Dist.,* 393 U.S. 503, 505-06 (1969), superimposing a peace sign on a flag, *Spence* v. *Washington*, 418 U.S. 405, 409 (1974), and contributing funds to a political campaign, *Buckley* v. *Valeo*, 424 U.S. 1, 19 (1976), to be expressive conduct.

But not all conduct is expressive.  Importantly, the fact that an actor intends to express an idea is not enough to bring that action within the purview of the First Amendment.  *See Zalewska* v. *County of Sullivan*, 316 F.3d 314, 319 (2d Cir. 2003); *see also United States* v. *O'Brien*, 391 U.S. 367, 376 (1968) ("We cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends ... to express an idea.").  Conduct is only entitled to constitutional protection if it is "sufficiently imbued with elements of communication[.]" *Johnson*, 491 U.S. at 404 (internal quotation marks and citation omitted).  This inquiry requires, "at the very least, an intent to convey a 'particularized message' along with a great likelihood that the message will be understood by those viewing it." *Zalewska*, 316 F.3d at 319 (quoting *Johnson*, 491 U.S. at

22

404).  In other words, courts must consider both the actor's subjective intent and how the conduct is objectively perceived.  *See Jones* v. *Schneiderman*, 974 F. Supp. 2d 322, 333 (S.D.N.Y. 2013) ("[A]lthough an actor's subjective intent is an important consideration, 'there is an objective component that requires consideration of whether, under the circumstances, the particular conduct is likely to be understood or perceived as expressing a particular message.'" (quoting *Grzywna* v. *Schenectady Cent. Sch. Dist.,* 489 F. Supp. 2d 139, 146 (N.D.N.Y. 2006))).

An activity need not communicate "a narrow, succinctly articulable message" to satisfy this test.  *Hurley* v. *Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.,* 515 U.S. 557, 569 (1995); *see also Jian Zhang* v. *Baidu.com Inc.*, 10 F. Supp. 3d 433, 437-38 (S.D.N.Y. 2014) ("[T]he First Amendment's protections apply whether or not a speaker articulates, or even has, a coherent or precise message, and whether or not the speaker generated the underlying content in the first place.").  The law tolerates some variation in how a message is communicated and perceived: "a private speaker does not forfeit constitutional protection simply by combining multifarious voices, or by failing to edit their themes to isolate an exact message as the exclusive subject matter of the speech."  *Hurley*, 515 U.S. at 569-70.

At least two courts have determined that line warming is expressive conduct protected by the First Amendment.  In one case, plaintiff organizations moved to enjoin a provision of Georgia's Senate Bill 202 ("S.B. 202") that prohibits the distribution of food, drinks, and other gifts to voters inside polling

places, within 150 feet of polling places (the "Buffer Zone"), and within 25 feet

of any individual standing in line to vote (the "Supplemental Zone").  *In re*

*Georgia Senate Bill 202*, --- F. Supp. 3d ----, 2022 WL 3573076, at *7 (N.D. Ga.

Aug. 18, 2022).  Prior to the enactment of S.B. 202, plaintiffs had engaged in

line warming activities including offering food, water, and other aid such as

chairs and phone chargers to individuals waiting in voting lines.  *Id.* at *2-4.  In

conjunction with the preliminary injunction motion, the *S.B. 202* court received

testimony from voters who had received that assistance in the past.  One voter

testified that he "understood the volunteers' efforts to convey a message that

voting is important."  *Id.* at *4.  Other voter-witnesses echoed that sentiment.

*Id.*  The *S.B. 202* Court made two key findings based on the evidence presented

with the preliminary injunction motion: (i) through their line warming

activities, the plaintiff organizations "intend to convey a message that voting is

important and that voters should remain in line to ensure their participation in

the democratic process," and (ii) voters understood the line warming activities

to convey a message of support and encouragement for their choice to exercise

their right to vote.  *Id.* at *11.

Ultimately, the *S.B. 202* Court held that the plaintiff organizations were

likely to succeed on the merits of their claim that line warming is protected

expressive conduct.  *S.B. 202*, 2022 WL 3573076, at *12.  In so concluding, it

rejected the argument that voters must perceive an identical message for

conduct to warrant constitutional protection, and explained that conduct can

be expressive so long as a reasonable person would infer "*some* sort of

24

message" from it, which the Georgia voter-witnesses did. *Id.* at \*11 (emphasis in original) (quoting *Holloman ex rel. Holloman* v. *Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004)).

Additionally, the *S.B. 202* Court relied on *Fort Lauderdale Food Not Bombs* v. *City of Fort Lauderdale*, 901 F.3d 1235 (11th Cir. 2018), in finding that context supported a finding that line warming is expressive. *S.B. 202*, 2022 WL 3573076, at \*10-11. In *Food Not Bombs*, the Eleventh Circuit concluded that a nonprofit's distribution of food in a public park was protected by the First Amendment because a reasonable person would understand the event to convey an anti-hunger message. *Food Not Bombs*, 901 F.3d at 1238-42. The *S.B. 202* Court found that context supported an expressive conduct finding because, like the conduct at issue in *Food Not Bombs*, the plaintiffs' activities took place in a traditional public forum; the gathering was not purely social because the plaintiffs distributed explanatory literature in connection with their activities; the plaintiffs offered their support to all regardless of political affiliation; the plaintiffs' message related to an issue of public concern; and the plaintiffs' activities involved food distribution, which has a "specific historical and cultural significance in the context of civil rights activities." *S.B. 202*, 2022 WL 3573076, at \*11.[7]

---

[7]     Ultimately, the *S.B. 202* Court found that the plaintiffs' challenge to Georgia's line warming ban was likely to succeed on the merits as to the Supplemental Zone but not as to the Buffer Zone. *In re Georgia Senate Bill 202*, --- F. Supp. 3d ----, 2022 WL 3573076, at \*20 (N.D. Ga. Aug. 18, 2022). It abstained from issuing a preliminary injunction, however, after finding that policy considerations weighed against issuing an injunction shortly before the November 2022 general election. *Id.* at \*27.

A Florida district court reached the same conclusion regarding a similar Florida voting regulation following a bench trial.  *See generally League of Women Voters of Fl., Inc.* v. *Lee*, 595 F. Supp. 3d 1042 (N.D. Fl. 2022) ("*LOWV*"). The statute at issue in *LOWV* made it a crime to, within 150 feet of a polling place, "engag[e] in any activity with the intent to influence or effect of influencing a voter[.]"  *Id.* at 1065.  This broad language "can be read to prohibit 'line warming' activities."  *Id.*  Like the plaintiffs in *S.B. 202*, the *LOWV* plaintiffs regularly engaged in various line warming activities before such activities were criminalized.  *See id.* at 1072-73.

The *LOWV* Court found line warming to be expressive conduct and thus subject to the protections of the First Amendment.  *LOWV*, 595 F. Supp. 3d at 1131.  It noted a "common thread" across the trial testimony: plaintiffs' intention to, through their line warming activities, communicate to voters "that their determination to exercise the franchise is important and celebrated."  *Id.* at 1130.  It also reached the same conclusions as to the *Food Not Bombs* factors as the *S.B. 202* court, finding that the buffer zone outside of polling places is a traditional public forum; that the plaintiffs' message was bolstered by signs and other printed materials; that the plaintiffs' assistance was open to all regardless of partisan affiliation; and that voting and democracy are issues of public concern.  *Id.* at 1130-31.  On balance, the *LOWV* court opined, these factors established the expressive nature of line warming.  *Id.* at 1131.

The Court sees no reason to deviate from the conclusion of these well-reasoned and thorough opinions, particularly at this preliminary stage of

litigation.  Accepting the facts as presented in the Amended Complaint, the Court finds that Plaintiff has alleged both its intent to convey a particularized message and a great likelihood that viewers will understand that message.

That Plaintiff intends to communicate a message through line warming is readily apparent from its pleading.  By giving food and drinks to voters, it intends "to convey the importance of [voters] staying in line, the importance of voting, and [to] emphasiz[e] that everyone's vote counts."  (AC ¶ 32; *see also id.* ¶ 22 (describing Plaintiff's intent to communicate "a celebration of our democracy and of the dedicated voters who endure weather and long waits to have their voices heard, as well as the rejection of voter suppression through long lines and wait times that severely burden our most fundamental rights")).  If substantiated, these allegations would support a finding of a sufficiently particularized message to warrant First Amendment protection.  *Cf. Zalewska*, 316 F.3d at 320 (deeming plaintiff's attempt to communicate "cultural values" by wearing a skirt was too "vague" to constitute protected expressive conduct); *E. Hartford Educ. Ass'n* v. *Bd. of Educ.,* 562 F.2d 838, 857-58 (2d Cir. 1977) (refusing to wear a necktie because it conveyed a message of non-conformity and a rejection of older traditions was "sufficiently vague" such that it was not expressive conduct).  That is true even if the evidence reveals some variety in how Plaintiff perceives and articulates its intended message (for instance, if one of Plaintiff's members testifies that by line warming she intends to communicate the importance of voting but another of Plaintiff's members

testifies that her line warming is in protest of voter suppression).  *See Hurley*, 515 U.S. at 569-70.

Plaintiff has also shown a sufficient likelihood that its message will be understood by those viewing it.  "[T]he context in which a symbol is used for purposes of expression is important, for the context may give meaning to the symbol." *Spence,* 418 U.S. at 410; *see also Lebowitz* v. *City of New York*, 606 F. App'x 17, 17-18 (2d Cir. 2015) (summary order) (finding that protestors' act of lying down in public park was expressive "under the circumstances").  The location and timing of expressive conduct are relevant to how that conduct is likely be perceived.  *See Tinker*, 393 U.S. at 505-14 (concluding that wearing black armbands conveyed anti-war message in the context of a school environment); *Spence*, 418 U.S. at 410 (finding that superimposing a peace symbol on flag communicated a message of protest because the display was "roughly simultaneous with" invasion of Cambodia and the Kent State shooting).  Plaintiff intends to engage in line warming at polling places during voting hours.  (AC ¶¶ 30, 32).  This context links Plaintiff's intended conduct (providing physical support to voters) to its intended message (that voting is important, that voters should remain in line, *etc.*).[8]  It is thus possible for Plaintiff to prove ultimately that viewers will understand its message, perhaps by offering the testimony of individuals who have benefited from, and

---

[8]     Although not binding on this Court, the Eleventh Circuit's multi-factor context test from *Food Not Bombs*, discussed *supra*, provides further support for the contention that voters will comprehend Plaintiff's intended message.  The *Food Not Bombs* factors apply to the present case in substantially the same way they applied to the line warming at issue in *LOWV* and *S.B. 202*.

understood the meaning of, line warming in the past.  *See S.B. 202*, 2022 WL 3573076, at *4; *LOWV*, 595 F. Supp. 3d at 1130-31 (both crediting such testimony).[9]  Put simply, how voters and other viewers will perceive Plaintiff's message is a fact question that cannot be resolved on a motion to dismiss.  For now, it is enough that Plaintiff has shown that its message is particularized and likely comprehensible.  *See Grzywna*, 489 F. Supp. 2d at 146 (denying motion to dismiss because plaintiff may be able to present proof substantiating her allegation that wearing a red, white, and blue necklace in school conveyed a message of support for U.S. troops).

Defendants' attempts to distinguish the Florida and Georgia line warming cases are not persuasive.[10]  In their view, *LOWV* does not govern because the plaintiffs there (i) had a history of line warming and (ii) intended to distribute literature along with provisions to make their intended message clear.  (*See* Def. Br. 18).  In arguing their first point, Defendants overlook a key factual difference between this case and the Florida and Georgia cases: line warming was lawful in Florida and Georgia prior to the enactment of the statutes challenged in *S.B. 202* and *LOWV*.  New York, by contrast, has maintained some iteration of a line warming ban for more than a century.  *See* L. 1908, ch. 503 § 1 (1906).  Unlike the Florida and Georgia plaintiffs, then, Plaintiff has not had an opportunity to engage in line warming without risking

---

[9]      The Court does not suggest that this is the only way Plaintiff can substantiate its claim.

[10]      *S.B. 202* was decided after briefing on the present motions was complete, but the Court presumes that Defendants take issue with *S.B. 202* for the same reasons that they object to *LOWV*.

criminal exposure.  As explained in depth previously, plaintiffs in a pre-enforcement challenge need not expose themselves to criminal liability prior to filing suit.  *See supra* Section A.2.  In any event, it is unclear why Plaintiff's history of line warming (or lack thereof) would bear on the present inquiry.

Defendants' argument that Plaintiff's message is not clear without supporting literature is stronger, but premature.  Of course, the presence of explanatory signage would make Plaintiff's message clearer.  But it is not a requirement for a finding of expressive conduct — it is merely one factor the factfinder may consider in evaluating the totality of the circumstances.  And it is not clear from the materials before the Court whether Plaintiff intends to support its message with signage or other written materials, and there is some suggestion that it does.  (*See* AC ¶ 30 (explaining that line warmers would be identified as Plaintiff's "members and volunteers")).  Ultimately, the clarity of Plaintiff's message to viewers (with or without supporting signage) is a question to be resolved by the factfinder upon a more developed record.

Defendants' argument that the First Amendment does not apply to "conduct intended to assist another person's exercise of his or her right to vote" is similarly unavailing.  (*See* Def. Br. 16-17).  The law imposes no such bright line rule.  Defendants rely exclusively on *Feldman* v. *Arizona Secretary of State's Office*, 840 F.3d 1057 (9th Cir. 2016), to support their proposition.  (*Id.*).  In *Feldman*, the Ninth Circuit upheld Arizona's prohibition on third-party ballot collection against a First Amendment challenge, finding that the act of ballot collection does not communicate a reasonably understandable message.  840

F.3d at 1084.  *Feldman* does not go so far as to say that all conduct that supports voting is *per se* constitutional.  And the expressive nature of conduct is a factual question evaluated on a case-by-case basis.  *See Hurley*, 515 U.S. at 567 ("[T]he reaches of the First Amendment are ultimately defined by the facts it is held to embrace[.]").

Because Plaintiff alleged both its intent to convey a particularized message and a great likelihood that viewers will understand that message, its allegation of expressive conduct is sufficiently pleaded.

### b.   Plaintiff Adequately Alleges That the Line Warming Ban Is Not Sufficiently Tailored to Withstand Strict or Intermediate Scrutiny

Having determined that Plaintiff's intended conduct implicates the First Amendment, the Court next considers whether the Line Warming Ban is a justified restriction on that expression.  The Constitution does not grant individuals *carte blanche* to speak whatever, wherever, and whenever they like. Instead, it seeks to balance the government's interest in regulating for the public welfare with the societal value of maintaining a free marketplace of ideas.  *See Virginia* v. *Black,* 538 U.S. 343, 358-60 (2003).  The amount of regulation the First Amendment tolerates depends on the type of restriction at issue.  1 RODNEY A. SMOLLA & MELVILLE B. NIMMER, SMOLLA & NIMMER ON FREEDOM OF SPEECH § 2:12 (2022) ("[T]he Court does not always apply the same level of judicial scrutiny to all conflicts involving freedom of speech.").  For instance, laws that target speech "because of the topic discussed or the idea or message expressed" are presumptively unconstitutional and subject to the strictest

31

scrutiny as content-based regulations. *Reed* v. *Town of Gilbert*, 576 U.S. 155, 163-64 (2015). By contrast, laws that limit only the "time, place, or manner" of protected speech, without regard for the content of that speech, are reviewed under an intermediate level of scrutiny. *Field Day, LLC* v. *County of Suffolk*, 463 F.3d 167, 174 (2d Cir. 2006). And laws that do not burden expression at all will withstand judicial review if justified by a rational basis. *See Ku Klux Klan,* 356 F.3d at 208.

The parties disagree on what level of scrutiny applies to the Line Warming Ban. In Plaintiff's view, the Line Warming Ban burdens core political speech and thus is subject to strict scrutiny. (Pl. Opp. 18). If strict scrutiny applies, the Line Warming Ban only passes constitutional muster if it is "the least restrictive means of achieving a compelling state interest." *McCullen* v. *Coakley*, 573 U.S. 464, 478 (2014). Defendants, by contrast, advocate for the less-exacting form of intermediate scrutiny defined in *United States* v. *O'Brien*, 391 U.S. 367, 376-77 (1968). (Def. Br. 18-21). A regulation withstands scrutiny under *O'Brien* if "[i] it is within the constitutional power of the Government; [ii] it furthers an important or substantial governmental interest; [iii] the governmental interest is unrelated to the suppression of free expression; and [iv] the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Young* v. *N.Y.C. Trans. Auth.*, 903 F.2d 146, 157 (2d Cir. 1990) (internal citation and quotation marks omitted).

The Court concludes that strict scrutiny is the applicable standard of review because the Line Warming Ban is a content-based restriction on speech.[11]  There are two types of content-based speech regulations: regulations that, on their face, restrict speech "because of its message, its ideas, its subject matter, or its content," and regulations that, though facially content neutral, "cannot be justified without reference to the content of the regulated speech, or that were adopted by the government because of disagreement with the message [the speech] conveys." *Town of Gilbert*, 576 U.S. at 163-64 (internal quotation marks and citations omitted).  Both are subject to strict scrutiny because they are premised on "the message the speaker conveys." *Id.* at 163.

The Line Warming Ban is a content-based speech regulation because it prohibits only a certain category of expression: gifting "any meat, drink, tobacco, refreshment or provision" to persons other than specified election and campaign officials "in connection with … any election[.]"  N.Y. Elec. Law § 17-140.  It does not prohibit all communication with prospective voters, but instead selectively carves out line warming.  Plaintiff could, for example,

---

[11]    Plaintiff emphasizes an alternative reason that the Line Warming Ban is subject to strict scrutiny: It burdens political speech, which is at the core of what the First Amendment protects.  *Ariz. Free Enter. Club's Freedom Club PAC* v. *Bennett*, 564 U.S. 721, 734 (2011).  It is not obvious to the Court that the Line Warming Ban restricts core political speech.  Core political speech cases often involve restrictions on advocacy for or against candidates or ballot issues.  *See, e.g.*, *FEC* v. *Wis. Right to Life, Inc.*, 551 U.S. 449, 477-81 (2007) (deeming "issue advocacy" political speech); *Silberberg* v. *Bd. of Elecs. of N.Y.*, 272 F. Supp. 3d 454, 469 (S.D.N.Y. 2017) (assuming that posting a selfie with one's ballot indicating candidate choice is political speech).  Although the Line Warming Ban regulates election-related advocacy, Plaintiff does not allege that it restricts advocacy for or against specific candidates or campaigns, and Plaintiff's own intended line warming is nonpartisan.  Defendants do not meaningfully grapple with this issue, and it is not necessary for the Court to decide it, because another ground for strict scrutiny applies and because the Line Warming Ban fails under intermediate scrutiny.

express its support for voting through written or spoken speech, or sell voters the same snacks it presently wishes to gift to them without running afoul of the Line Warming Ban.[12]  Because the Line Warming Ban uniquely targets Plaintiff's intended communication, but permits expression on other topics, it is a content-based regulation.  *See Burson* v. *Freeman*, 504 U.S. 191, 197-98 (1992) (deeming law restricting campaign-related speech within one hundred feet of polling places a content-based restriction); *S.B. 202*, 2022 WL 3573076, at *14-18 (determining that Georgia's line warming ban is a content-based speech regulation subject to strict scrutiny).[13]  Defendants' only argument to the contrary is that Plaintiff's intended conduct is not expressive (*see* Def. Br. 2), an argument the Court has addressed and rejected previously.

Defendants' invocation of *O'Brien* is misplaced.  In Defendants' view, *O'Brien*'s intermediate scrutiny applies because the Line Warming Ban regulates conduct that contains both speech and nonspeech elements.  (Def. Br. 18-19).  To be sure, this view finds some support in the language of *O'Brien* itself, which states that "when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms."  *O'Brien*, 391 U.S. at 366.  But Defendants make too

---

[12]   The Court expresses no opinion on whether these actions are proscribed by other New York laws or regulations, or whether they are constitutionally protected.

[13]   Of course, what potential universe of expressive conduct is criminalized by the Line Warming Ban is the subject of Plaintiff's vagueness and overbreadth challenges, and the Court does not mean to comment on that point in this part of its analysis.

much of this single sentence.  "*O'Brien* is emphatically *not* the First
Amendment test applicable to symbolic speech or to expressive conduct."
SMOLLA & NIMMER § 11:7.  A more scrupulous reading of *O'Brien* and
subsequent cases makes clear that *O'Brien*'s intermediate scrutiny applies only
to content-neutral regulations, which may or may not involve expressive
conduct.  *Humanitarian Law Proj.*, 561 U.S. at 27 ("*O'Brien* does not provide
the applicable standard for reviewing a content-based regulation of speech[.]");
*see also City of Erie* v. *Pap's A.M.*, 529 U.S. 277, 289 (2000) (clarifying that
*O'Brien* applies when "the governmental purpose in enacting the regulation is
unrelated to the suppression of expression"); *White River Amusement Pub, Inc.*
v. *Town of Hartford*, 481 F.3d 163, 169 (2d Cir. 2007) (applying *O'Brien* to
challenge of content-neutral town ordinance).  In other words, *O'Brien* stands
for the accepted proposition that even a content-neutral regulation may run
afoul of the First Amendment where the regulation places more than an
incidental limitation on otherwise protected speech.

  This distinction is without a difference, however, because Plaintiff's claim
survives even under *O'Brien*.  Recall that under *O'Brien*, a restriction on speech
is valid only if "[i] it is within the constitutional power of the Government; [ii] it
furthers an important or substantial governmental interest; [iii] the
governmental interest is unrelated to the suppression of free expression; and
[iv] the incidental restriction on alleged First Amendment freedoms is no
greater than is essential to the furtherance of that interest."  *Young*, 903 F.3d
at 157.  Plaintiff acknowledges that the first three of these requirements are not

genuinely at issue, and with good reason.  (*See* Pl. Opp. 20-21).  For starters, New York has "broad power" to regulate elections within its borders.  *Wash. State Grange* v. *Wash. State Republican Party*, 552 U.S. 442, 451 (2008).  And the Line Warming Ban is aimed at the State's "obviously … compelling" interests in "protecting the right of its citizens to vote freely for the candidates of their choice" and "protect[ing] the right to vote in an election conducted with integrity and reliability."  *Burson*, 504 U.S. at 198-99; *see also Silberberg* v. *Bd. of Elecs.*, 272 F. Supp. 3d 454, 469-70 (S.D.N.Y. 2017) (recognizing New York's compelling interests in preventing election fraud and "protecting voters from confusion and undue influence" (internal quotation omitted)).

The constitutionality of the Line Warming Ban thus turns on whether it is sufficiently tailored to serve those purposes.  Under *O'Brien*, a speech restriction withstands intermediate scrutiny if it is "narrowly tailored," meaning it is "'no greater than essential'" to achieving the state's substantial interest.  *Young*, 903 F.2d at 159 (quoting *O'Brien*, 391 U.S. at 377).  In other words, the regulation "need not be the least restrictive or least intrusive means" of achieving the state's goal, but the state must show that its interest "would be achieved less effectively absent the regulation.'"  *Ward* v. *Rock Against Racism*, 491 U.S. 781, 798-99 (1989) (quoting *United States* v. *Albertini,* 472 U.S. 675, 689 (1985)).  If a law "burden[s] substantially more speech than is necessary to forward the [state]'s legitimate interest," it cannot withstand intermediate scrutiny.  *Id.* at 799.

The Line Warming Ban is not narrowly tailored because it criminalizes a vast amount of conduct that does not implicate the state's interest in shielding voters from undue influence.  For one, the Line Warming Ban potentially reaches the entirety of New York's geographic territory.  The State has a legitimate interest in protecting voters from being intimidated or influenced near the polls.  But at some distance from the polls, that interest is outweighed by speakers' rights to advocate for candidates and issues.  *See Ariz. Free Enter. Club's Freedom Club PAC* v. *Bennett*, 564 U.S. 721, 734 (2011) (explaining that the First Amendment "has its fullest and most urgent application to speech uttered during a campaign for political office" (internal quotation marks and citation omitted)).

In *Burson* v. *Freeman*, the Supreme Court upheld Tennessee's ban on electioneering within one hundred feet of polling places, reasoning that this "minor geographic limitation" on speech was not "a significant impingement" on speakers' First Amendment rights.  504 U.S. 191, 210-11 (1992) (declining to impose geographic litmus test to separate valid from invalid restrictions, but finding Tennessee's statute "on the constitutional side of the line"); *see also S.B. 202*, 2022 WL 3573076, at *19 (finding line warming prohibition within 150 feet of Georgia polling places sufficiently tailored to withstand strict scrutiny).  But the Supreme Court was careful to note that "[a]t some measurable distance from the polls, ... governmental regulation of vote solicitation could effectively become an impermissible burden[.]"  *Burson*, 504 U.S. at 210.  By its plain terms, the Line Warming Ban applies at any distance

37

from New York's voting locations, so long as the gift-giving is "in connection with or in respect of any election during the hours of voting," N.Y. Elec. Law § 17-140, and thus reaches substantially more speech than necessary to prevent voter intimidation.

The Line Warming Ban's broad substantive reach lends further support to the conclusion that its restrictions are disproportionate to the evils it seeks to prevent.  In addition to banning gift-giving with partisan intention, the Line Warming Ban bars nonpartisan expression like that contemplated by Plaintiff.  (*See* AC ¶¶ 13, 21, 25, 31 (emphasizing that Plaintiff is a nonpartisan nonprofit with no intention to engage in electioneering while supporting voters)).  It is not clear to the Court how offering a voter a water bottle and a donut, with no mention of any candidate or issue on the ballot, could impair a citizen's ability to vote freely for the candidates of their choice, or that such conduct would be taken as expressing a preference for any candidate, party, or issue.

Defendants argue that the Line Warming Ban is justified because it "shield[s] voters from all unnecessary interactions when waiting to vote[.]"  (Def. Reply 8).  Not so; the Line Warming Ban appears to permit many types of interactions with voters (so long as those interactions are not accompanied by gifts of food or water), while prohibiting a vast array of innocent, protected expression.  The Line Warming Ban is a sweeping prohibition that criminalizes significantly more expression than is necessary to protect the integrity of the franchise.  Because the Line Warming Ban is not narrowly tailored to promote New York's interest in preventing voter harassment and intimidation, Plaintiff

38

has stated a claim that it impermissibly restricts expressive conduct protected by the First Amendment.[14]

### 3. Plaintiff States a Claim That the Line Warming Ban Is Impermissibly Vague in Violation of the Due Process Clause of the Fourteenth Amendment

Though Plaintiff's next claim arises under a different provision of the Constitution, it also survives dismissal, at least in part. The Due Process Clause of the Fourteenth Amendment ensures that "no one may be required … to speculate as to the meaning of penal statutes." *Farrell* v. *Burke*, 449 F.3d 470, 484-85 (2d Cir. 2006) (quoting *Lanzetta* v. *New Jersey*, 306 U.S. 451, 453 (1939)). Through the void-for-vagueness doctrine, it ensures that the parties who enforce criminal laws and the parties who are regulated by them have fair notice of what conduct is permitted and what conduct is criminal. *United States* v. *Williams*, 553 U.S. 285, 304 (2008). In other words, the vagueness doctrine ensures that statutes are drafted "with sufficient clarity to give the person of ordinary intelligence a reasonable opportunity to know what is prohibited and to provide explicit standards for those who apply them." *Thibodeau* v. *Portuondo,* 486 F.3d 61, 65 (2d Cir. 2007) (internal citations and quotation marks omitted).

---

[14]   Because the Line Warming Ban fails under *O'Brien*'s intermediate scrutiny, it certainly does not withstand strict scrutiny. A speech restriction survives strict scrutiny only if it is "the least restrictive means of achieving a compelling state interest." *McCullen* v. *Coakley*, 573 U.S. 464, 478 (2014). A law is not the least restrictive means of achieving the state's goal if it targets conduct already criminalized by other state laws. *Id.* at 490-92. Defendants do not even attempt to explain how the Line Warming Ban prevents voter intimidation that is not already regulated by New York's prohibitions on electioneering within 100 feet of polling places, displaying marked ballots, and vote buying. *See* N.Y. Elec. Law §§ 8-104[1], 17-130[10], 17-142.

"A statute can be impermissibly vague for either of two independent reasons.  First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.  Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *VIP of Berlin, LLC* v. *Town of Berlin,* 593 F.3d 179, 186 (2d Cir. 2010) (internal quotation marks and citation omitted); *see also Williams*, 553 U.S. at 304.  The first basis for finding vagueness — lack of warning to regulated parties — is "an objective one" that requires courts to assess "'whether the law presents an ordinary person with sufficient notice of or the opportunity to understand what conduct is prohibited or proscribed,' not whether a particular plaintiff actually received a warning that alerted him or her to the danger of being held to account for the behavior in question." *Dickerson* v. *Napolitano,* 604 F.3d 732, 745-46 (2d Cir. 2010) (quoting *Thibodeau,* 486 F.3d at 67).  The second basis for finding vagueness — lack of sufficient enforcement guidance — "does not ban *all* discretion on the part of police officers or prosecutors[,]" *Thibodeau,* 486 F.3d at 69 (emphasis in original), but does invalidate laws that accord "unfettered discretion" to enforcers, *Hayes* v. *N.Y. Att'y Grievance Comm.,* 672 F.3d 158, 169 (2d Cir. 2012), or task enforcers with interpreting unclear statutory text without the aid of "statutory definitions, narrowing context, or settled legal meanings," *Williams*, 553 U.S. at 306.

Courts apply this test with particular vigilance to statutes that implicate First Amendment rights.  *Farrell*, 449 F.3d at 485 ("[V]agueness in the law is particularly troubling when First Amendment rights are involved.").  This is

40

because indefinite laws have the potential to chill protected expression —
actors at the fringes of a criminal prohibition may choose to be silent rather
than risk enforcement.  *See Grayned* v. *City of Rockford,* 408 U.S. 104, 108-09
(1972) ("[W]here a vague statute abuts upon sensitive areas of basic First
Amendment freedoms, it operates to inhibit the exercise of those freedoms.
Uncertain meanings inevitably lead citizens to steer far wider of the unlawful
zone than if the boundaries of the forbidden areas were clearly marked."
(alteration adopted and internal quotation marks omitted)); *see also NAACP* v.
*Button*, 371 U.S. 415, 433 (1963) ("First Amendment freedoms need breathing
space to survive[.]").  Accordingly, statutes that potentially restrict protected
speech or association are held to a "more stringent" vagueness test than
statutes that do not implicate fundamental rights.  *Humanitarian Law Proj.*,
561 U.S. at 19 (quoting *Hoffman Ests.* v. *Flipside, Hoffman Ests., Inc.*, 455 U.S.
489, 495 (1982)); *see also Smith* v. *Goguen,* 415 U.S. 566, 573 (1974) ("Where a
statute's literal scope, unaided by a narrowing state court interpretation, is
capable of reaching expression sheltered by the First Amendment, the doctrine
demands a greater degree of specificity than in other contexts."); *Commack Self-
Serv. Kosher Meats, Inc.* v. *Hooker,* 680 F.3d 194, 213 (2d Cir. 2012) ("The
degree of vagueness tolerated in a statute varies with its type: economic
regulations are subject to a relaxed vagueness test, laws with criminal
penalties to a stricter one, and laws that might infringe constitutional rights to
the strictest of all." (quoting *VIP of Berlin*, 593 F.3d at 186)).

Despite this "heightened standard," not every statute that implicates speech is unconstitutionally vague.  *Humanitarian Law Proj.*, 561 U.S. at 21; *see, e.g.*, *Grayned,* 408 U.S. at 113-14 (rejecting a vagueness challenge to a criminal law that implicated First Amendment activities near schools).  The Supreme Court has not clearly defined how courts should evaluate vagueness challenges to criminal prohibitions that implicate the First Amendment, but has cautioned that "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity."  *Rock Against Racism*, 491 U.S. at 794.

Courts employ a number of tools to review statutes for vagueness.  Chief among these tools is examination of the words of the statute.  *Grayned*, 408 U.S. at 110.  Courts do not look at statutory language in isolation; rather, they "consider[] the language in context, with the benefit of the canons of statutory construction and legislative history."  *Commack Self-Serv. Kosher Meats*, 680 F.3d at 213 (citing *United States* v. *Farhane,* 634 F.3d 127, 142 (2d Cir. 2011)).  Additionally, courts consider "the interpretations the relevant courts have given to analogous statutes, 'and, perhaps to some degree, to the interpretation of the statute given by those charged with enforcing it.'"  *Id.*  (quoting *Grayned*, 408 U.S. at 110).

There are two types of vagueness challenges: as-applied challenges, which concern the clarity of the law as applied to the plaintiff's conduct, and facial challenges, in which the court considers a statute's application to

42

hypothetical circumstances.  Plaintiff brings both types of challenge (*see* AC ¶ 54), and the Court addresses each in turn.

### a.  Plaintiff Fails to State a Claim That the Line Warming Ban Is Vague As Applied

"A court should ... examine the complainant's conduct before analyzing other hypothetical applications of the law."  *Hoffman Ests.,* 455 U.S. at 495. The Court thus begins with Plaintiff's as-applied challenge.  If a plaintiff's proposed conduct is plainly proscribed by the challenged statute, an as-applied vagueness challenge must fail because the plaintiff is on notice of the unlawfulness of their (intended) conduct.  *Humanitarian Law Proj.*, 561 U.S. at 21; *see also Farrell*, 449 F.3d at 492.  To evaluate Plaintiff's as-applied challenge, the Court first recalls what potentially unlawful conduct Plaintiff intends to engage in, then determines whether that conduct is proscribed by the Line Warming Ban.

Plaintiff's anticipated conduct falls readily within the Line Warming Ban's plain terms.  Plaintiff and its members intend to distribute "sundries such as bottled water, donuts, potato chips, or pizza" valued at more than one dollar to individuals waiting in line to vote in New York elections.  (AC ¶¶ 25, 30, 32). The drinks and snacks Plaintiff describes are clearly "drink[s]," "refreshment[s]," or "provisions" within the meaning of the statute.  *See* N.Y. Elec. Law § 17-140.  And the time and place of Plaintiff's intended line warming — at the polls during voting hours — is obviously "in connection with or in respect of any election during the hours of voting on a day of a general,

special or primary election[.]"  *See id.*  Plaintiff's anticipated line warming is unlawful.

Despite acknowledging that the Line Warming Ban "clearly prohibits food sharing at the polls," Plaintiff now asserts that the law "fails to provide [Plaintiff] the information necessary to protect itself from criminal prosecution" because its geographic and temporal scope are unclear.  (Pl. Opp. 25).  Such assertions, however, exist in tension with Plaintiff's argument that it has standing because it faces a credible threat of being prosecuted for violating the Line Warming Ban.  The Court would be more sympathetic to Plaintiff's concerns had it alleged an intention to engage in conduct at the outermost edges of the Line Warming Ban.  But because Plaintiff has notice that its contemplated activities are clearly unlawful, it cannot claim that the statute is impermissibly vague as applied.  *See VIP of Berlin*, 593 F.3d at 189 ("[I]n the context of an as-applied vagueness challenge, a court's analysis should be confined to the litigant's *actual* conduct, and a court should not analyze whether a reasonable person would understand that certain hypothetical conduct or situations violate the statute.").

### b.    Plaintiff States a Claim That the Line Warming Ban Is Facially Vague

Because federal litigants typically may only sue to assert their own rights and interests, the law strongly disfavors facial challenges by parties whose own rights are not violated.  That said, "[t]he general rule disfavoring facial vagueness challenges does not apply in the First Amendment context."  *Farrell*, 449 F.3d at 496.  The Supreme Court explained:

> Our cases ... recognize a different approach where the statute at issue purports to regulate or proscribe rights of speech or press protected by the First Amendment.  Although a statute may be neither vague, overbroad, nor otherwise invalid as applied to the conduct charged against a particular [party], he is permitted to raise its vagueness or unconstitutional overbreadth as applied to others.  And if the law is found deficient in one of these respects, it may not be applied to him either, until and unless a satisfactory limiting construction is placed on the statute.

*Coates* v. *City of Cincinnati,* 402 U.S. 611, 619-20 (1971) (White, J., dissenting) (internal citations omitted); *see also Forsyth Cnty.* v. *Nat'list Movement,* 505 U.S. 123, 129 (1992) ("It is well established that in the area of freedom of expression an overbroad regulation may be subject to facial review and invalidation, even though its application in the case under consideration may be constitutionally unobjectionable.").  Because the Line Warming Ban raises serious First Amendment concerns, and because Defendants do not question Plaintiff's standing to challenge the Line Warming Ban as facially vague, the Court is satisfied that Plaintiff's facial vagueness claim is properly before it.

Plaintiff argues that the Line Warming Ban is facially vague because it fails to provide persons of reasonable intelligence notice of what conduct it prohibits.  (Pl. Opp. 23-25).  On this point, Plaintiff does not take issue with all of the statute's language.  Instead, its objections are focused on two phrases: (i) "in connection with or in respect of any election," and (ii) "provisions."  (Pl. Opp. 24-25).

45

Plaintiff has adequately pleaded that both phrases lack the specificity required for criminal statutes.  Plaintiff argues that the phrase "in connection with or in respect of any election" is indeterminate because it does not provide a territorial limitation: "How far away must one go before one can offer food and drink to passerby?"  (Pl. Opp. 24).  Both parties agree that the Line Warming Ban applies to the 100-foot radius around polling places where New York law bans electioneering.  (Def. Br. 22; Pl. Opp. 24).  But it is not apparent to the Court whether it would apply to an individual who offers snacks to voters in the polling place parking lot before they get in line to vote, or whether it bars Plaintiff from distributing snacks to New York voters on election day at its Brooklyn headquarters.  Defendants do not offer any limiting construction of the phrase.  This lack of clarity raises serious constitutional questions.

The meaning of "provision" in the statutory phrase "meat, drink, tobacco, refreshment or provision" is also not readily apparent.  In Defendants' view, "provision" refers only to consumable items because under the interpretive canons of *ejusdem generis* and *noscitur a sociis*, it should be read as consistent with the other listed items.  (Def. Br. 23).  Under this logic, the Line Warming Ban prohibits Plaintiff and others from gifting food and drinks to voters, but permits them to give hand sanitizer, umbrellas, and other inedible goods.  Plaintiff reads the term more broadly, noting that the plain meaning of "provision," as defined by the Merriam-Webster dictionary, is not limited to consumable goods and instead covers all "needed materials or supplies[.]"  (Pl. Opp. 25).  Both are valid approaches to statutory interpretation.  *See Ali* v. *Fed.*

46

*Bur. of Prisons*, 552 U.S. 214, 223-26 (2008) (discussing the *ejusdem generis* and *noscitur a sociis* canons of construction); *Taniguchi* v. *Kan Pac. Saipan, Ltd.*, 556 U.S. 560, 556-59 (2012) (looking to dictionary definitions to interpret undefined statutory terms).

History adds a further wrinkle to the Court's interpretive task. A predecessor statute to the Line Warming Ban, enacted in 1892, unambiguously applied to non-consumable goods: it prohibited the furnishing of "entertainment" to electors and the provision of "money other property" to induce individuals to vote. L. 1892, ch. 693, § 41o. One could argue that the New York legislature's subsequent redrafting of the statue signaled its intent to limit the Line Warming Ban to consumable goods. But one could also argue that the legislature intended the term "provision" to be a broad catchall that incorporated the conduct prohibited by the prior iteration of the statute. The Court cannot determine the significance of the nineteenth-century prohibition vis-à-vis the Line Warming Ban without more briefing on the Ban's legislative history.

In light of the colorable arguments from both parties, the Court will not dismiss Plaintiff's facial vagueness claim on the limited record before it. "[A] more fulsome analysis of the language and legislative history of the statute [is] necessary" to determine whether the law provides adequate notice of its reach or contains any meaningful limiting principle in light of its evolution over time and tools of statutory construction. *Muchmore's Cafe, LLC* v. *City of New York*, No. 14 Civ. 5668 (RRM), 2016 WL 11469539, at *17 (E.D.N.Y. Sept. 29, 2016).

Whatever the ultimate outcome, Plaintiff has certainly carried its burden at this stage in the litigation.

### 4.    Plaintiff States a Claim That the Line Warming Ban Is Facially Overbroad in Violation of the First Amendment

Finally, Defendants move to dismiss Plaintiff's overbreadth claim.  (Def. Br. 24-25).  A statute is unconstitutionally overbroad if it punishes a substantial amount of protected free speech, judged in relation to legitimate sweep.  *Virginia* v. *Hicks,* 539 U.S. 113, 122 (2003).  The overbreadth doctrine, which is rooted in the First Amendment, seeks to balance competing interests:

> On the one hand, the threat of enforcement of an overbroad law deters people from engaging in constitutionally protected speech, inhibiting the free exchange of ideas.  On the other hand, invalidating a law that in some of its applications is perfectly constitutional — particularly a law directed at conduct so antisocial that it has been made criminal — has obvious harmful effects.

*Williams*, 553 U.S. at 292.  In recognition of this tension, courts "vigorously enforce[] the requirement that a statute's overbreadth be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *Id.* at 292 (emphasis in original).  Although conceptually related, overbreadth and vagueness are distinct doctrines: "A clear and precise enactment may nevertheless be 'overbroad' if in its reach it prohibits constitutionally protected conduct."  *Grayned,* 408 U.S. at 114.

"All overbreadth challenges are facial challenges because an overbreadth challenge by its nature assumes that the measure is constitutional as applied to the party before the court."  *Farrell*, 449 F.3d at 498.  The rules that

generally govern facial challenges are relaxed in the overbreadth context.  For

one, a plaintiff may bring an overbreadth claim even if the challenged statute is

lawful as-applied.  *Id.* at 499 ("A plaintiff claiming overbreadth need not show

that the challenged regulation injured his or her First Amendment interests in

any way[.]").  Additionally, while a challenger must typically show that no set of

circumstances exists under which the challenged statute would be valid to

prevail on a facial attack, a law can be invalidated as overbroad so long as a

"substantial" number of its applications are unconstitutional.  *United States* v.

*Stevens*, 559 U.S. 460, 472-73 (2010).

Overbreadth analysis proceeds in two parts.  "The first step in

overbreadth analysis is to construe the challenged statute; it is impossible to

determine whether a statute reaches too far without first knowing what the

statute covers."  *Williams,* 553 U.S. at 293.  The second step is to determine

whether the law, as construed, "criminalizes a substantial amount of

protected expressive activity."  *Id.* at 297.

For reasons that are by now familiar, the Court finds that Plaintiff

satisfies its motion to dismiss burden at both steps.  Taking Plaintiff's well-

pleaded allegations as true, the Line Warming Ban restricts the expressive act

of offering food and water to voters in encouragement of their exercise of the

franchise.  Some limitations on this protected right may be constitutionally

permissible, such as prohibiting partisan line warming within a narrow radius

immediately adjacent to polling places.  *See Burson*, 504 U.S. 201-11; *S.B. 202*,

2022 WL 3573076, at *14-18.  But the Line Warming Ban is not so

49

circumscribed.  It prohibits both partisan and nonpartisan line warming within potentially all of New York State.  As such, it potentially "consumes vast swaths of core First Amendment speech."  *LOWV*, 595 F. Supp. 3d at 1138.  Because Plaintiff has adequately alleged that the Line Warming Ban's overbreadth is substantial relative to its legitimate sweep, it has stated a claim for overbreadth.

## CONCLUSION

For all of the reasons stated above, Defendants' motions to dismiss Plaintiff's expressive conduct, overbreadth, and facial vagueness claims are DENIED, and Defendants' motions to dismiss Plaintiff's as-applied vagueness claim are GRANTED.  The Clerk of Court is directed to terminate the motions at docket entries 41 and 42.  Additionally, the Clerk of Court is directed to terminate the motion at docket entry 33, as it was mooted by the filing of the Amended Complaint.

The parties are hereby ORDERED to confer and submit a proposed case management plan on or before **March 16, 2023**.

SO ORDERED.

Dated:  February 23, 2023
        New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

50