UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

THE BROOKLYN BRANCH OF THE NATIONAL
ASSOCIATION FOR THE ADVANCEMENT OF
COLORED PEOPLE,

                Plaintiff,

            -v.-

PETER S. KOSINSKI, *in his official capacity as Co-Chair of the State Board of Elections*; DOUGLAS A. KELLNER, *in his official capacity as Co-Chair of the State Board of Elections*; ANTHONY J. CASALE, *in his official capacity as Commissioner of the State Board of Elections*; KRISTEN ZEBROWSKI STAVISKY, *in her official capacity as Co-Executive Director of the State Board of Elections*; SIMON SHAMOUN, *in his official capacity as Commissioner of the New York City Board of Elections*; RODNEY L. PEPE-SOUVENIR, *in her official capacity as Commissioner of the New York City Board of Elections*; JOSE MIGUEL ARAUJO, *in his official capacity as Commissioner of the New York City Board of Elections*; MICHAEL J. COPPOTELLI, *in his official capacity as Commissioner of the New York City Board of Elections*; GINO A. MARMORATO, *in his official capacity as Commissioner of the New York City Board of Elections*; JODI MORALES, *in her official capacity as Commissioner of the New York City Board of Elections*; KEITH SULLIVAN, *in his official capacity as Commissioner of the New York City Board of Elections*; PATRICIA ANNE TAYLOR, *in her official capacity as Commissioner of the New York City Board of Elections*; *and* FREDERIC M. UMANE, *in his official capacity as President of the New York City Board of Elections,*

            Defendants

---

21 Civ. 7667 (KPF)

**FINDINGS OF FACT
AND CONCLUSIONS
OF LAW**

KATHERINE POLK FAILLA, District Judge:

## BACKGROUND[1]

New York has banned the handing out of food and drink to voters at polling places — often referred to as line warming — for over 100 years.  The current iteration of this restriction, enacted in 1992, is set forth in Section 17-140 of the New York Election Law, N.Y. Elec. Law § 17-140 ("Section 17-140" or the "Line Warming Ban").  The Line Warming Ban imposes a blanket prohibition, making it a misdemeanor to provide "any meat, drink, tobacco, refreshment or provision" to "any other person in connection with or in respect of any election during the hours of voting."  N.Y. Elec. Law § 17-140.

Plaintiff, the Brooklyn Branch of the National Association for the Advancement of Colored People ("Plaintiff" or "Brooklyn NAACP"), argues that the Ban is unconstitutional, as it needlessly criminalizes the provision of such support, thereby prohibiting Plaintiff and other entities like it from engaging in the protected expressive conduct of encouraging voters to exercise their right to

---

[1] For convenience, the Court adopts the citing conventions used in its prior opinion in this case, *Brooklyn Branch of Nat'l Ass'n for Advancement of Colored People* v. *Kosinski*, 657 F. Supp. 3d 504 (S.D.N.Y. 2023) ("*Kosinski I*").  This Court relied on several documents in drafting this Opinion, including the transcript of the trial ("Trial Tr." (Dkt. #109)) and the exhibits that Plaintiff ("Pl. Ex.") and Defendants ("Def. Ex.") introduced during that trial; Plaintiff's Pre-Trial Memorandum of Law ("Pl. Br." (Dkt. #89)); Defendant State Board's Pre-Trial Memorandum of Law ("Def. Br." (Dkt. #82)); Plaintiff's Proposed Findings of Fact and Conclusions of Law ("Pl. FFCL" (Dkt. #113)); and Defendant State Board's Proposed Findings of Fact and Conclusions of Law ("Def. FFCL" (Dkt. #112)).  The City Board Defendants did not submit a pre-trial memorandum of law and have largely adopted the State Board's Proposed Findings of Fact and Conclusions of Law.  Therefore, although the Court carefully considered the City Board's submissions, the Opinion cites exclusively to the State Board's submissions.

For ease of reference, all citations to the parties' proposed findings of fact and conclusions of law in this Opinion incorporate the underlying citations to the record.  Further, citations to a witness's sworn statements will be referred to using the convention "[Name] Decl."

vote.  Plaintiff asserts that — but for the Ban — it would offer water and other refreshments to voters at polling places, particularly those voters subjected to some of the longest lines to vote.  Accordingly, Plaintiff challenges the statute as violative of its right to freedom of expression under the First Amendment to the U.S. Constitution.  Plaintiff also challenges the statute as overly broad on its face and impermissibly vague, in violation of the First and Fourteenth Amendments.  Defendants, individuals comprising the New York City Board of Elections (the "City Board") and the New York State Board of Elections (the "State Board"), argue, *inter alia*, that Plaintiff lacks standing to pursue its claims and that the Ban does not violate the Constitution.

Following extensive motion practice and discovery, on March 4, 2024, the Court held a one-day bench trial to resolve the parties' remaining disputes concerning the constitutionality of the Line Warming Ban.  Since then, the Court has reviewed the parties' pre- and post-trial submissions, the transcript of the trial, and the trial exhibits.  The Court has considered those materials in light of its own recollections of the trial and its perception of the credibility of the witnesses who testified.  For the reasons that follow, the Court finds that the Line Warming Ban is unconstitutional.

## PROCEDURAL HISTORY

Plaintiff initiated this action by filing a complaint on September 14, 2021.  (Dkt. #1).  In lieu of answering the complaint, on January 14, 2022, after receiving two extensions of the answer deadline, the State Board and City Board each filed pre-motion letters seeking leave to file a motion to dismiss

under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  (Dkt. #28 (State Board); Dkt. #29 (City Board)).  Plaintiff filed a letter outlining its opposition to the intended motions on January 20, 2022.  (Dkt. #30).  The Court dispensed with its usual requirement of a pre-motion conference and set a briefing schedule for the contemplated motions to dismiss.  (Dkt. #31).  Pursuant to that schedule, Defendants filed their motions to dismiss and accompanying papers on March 1, 2022.  (Dkt. #32-34).

On March 22, 2022, Plaintiff filed the Amended Complaint (or "AC") as of right under Federal Rule of Civil Procedure 15(a)(1)(B).  (Dkt. #38).  The AC is the operative complaint in this matter, and it alleges that the Line Warming Ban violates the First and Fourteenth Amendments to the U.S. Constitution because it (i) burdens the right of Plaintiff and its members to freedom of expression, (ii) is overly broad on its face, and (iii) is not sufficiently clear as to what conduct it prohibits.  (AC ¶¶ 38-64).  Plaintiff seeks a declaration that the Line Warming Ban is unconstitutional, an injunction preventing enforcement of the Line Warming Ban, and an award of costs and attorneys' fees.  (*Id.* at 18 (Prayer for Relief)).

The parties agreed that Plaintiff's filing of the AC mooted the then-pending motions to dismiss and proposed a schedule for Defendants to renew their motions.  (Dkt. #39).  The Court adopted the parties' proposed briefing schedule (Dkt. #40) and, in accordance with that schedule the parties briefed the renewed motions to dismiss (Dkt. #41-45).  After considering those motions, on February 23, 2023, the Court issued an Opinion and Order

denying Defendants' motions to dismiss Plaintiff's expressive conduct, overbreadth, and facial vagueness claims and granting Defendants' motions to dismiss Plaintiff's as-applied vagueness claim. (Dkt. #50). *See Brooklyn Branch of Nat'l Ass'n for Advancement of Colored People* v. *Kosinski*, 657 F. Supp. 3d 504, 534-35 (S.D.N.Y. 2023) ("*Kosinski I*").

Following the issuance of *Kosinski I*, Defendants filed their respective answers to the AC. (Dkt. #51 (State Board), 52 (City Board)). On March 17, 2023, the City Board filed an Amended Answer to the AC. (Dkt. #57). The parties subsequently proceeded to discovery in accordance with a case management plan entered by the Court that same day. (Dkt. #58). During an October 18, 2023 pretrial conference, the Court scheduled a date and time for the bench trial. (*See* October 18, 2023 Minute Entry). The Court also entered a scheduling order for the parties' Joint Pretrial Order, motions *in limine*, and any pre-trial memoranda of law. (Dkt. #72). In accordance with the schedule, the parties duly submitted their pre-trial submissions, and, on February 22, 2024, the Court held a pre-trial conference largely resolving the parties' motions *in limine*. (*See* February 22, 2024 Minute Entry). The bench trial for this action was held on March 4, 2024. (*See* March 4, 2024 Minute Entry; Dkt. #109 (transcript)).

Following the conclusion of the bench trial, on April 12, 2024, the parties separately submitted their respective proposed findings of fact and conclusions of law. (Dkt. #111 (City Board), 112 (State Board), 113 (Brooklyn NAACP)).

Having now carefully considered the parties' arguments, the Court is prepared to issue its decision.

## FINDINGS OF FACT

### A.   New York's Line Warming Ban and its Administrators

It has long been a crime in New York State to provide food, drink, or other sundries to individuals waiting in line to vote.  The current iteration of this restriction, enacted in 1992, is set forth in Section 17-140 of the New York Election Code, which is titled "Furnishing money or entertainment to induce attendance at polls."  In full, Section 17-140 provides:

> Any person who directly or indirectly by himself or through any other person in connection with or in respect of any election during the hours of voting on a day of a general, special or primary election gives or provides, or causes to be given or provided, or shall pay, wholly or in part, for any meat, drink, tobacco, refreshment or provision to or for any person, other than persons who are official representatives of the board of elections or political parties and committees and persons who are engaged as watchers, party representatives or workers assisting the candidate, except any such meat, drink, tobacco, refreshment or provision having a retail value of less than one dollar, which is given or provided to any person in a polling place without any identification of the person or entity supplying such provisions, is guilty of a Class A misdemeanor.

N.Y. Elec. Law § 17-140.

In New York, Class A misdemeanors are punishable by up to one year's imprisonment or up to three years' probation and a monetary fine.  N.Y. Penal Law §§ 70.15(1), 65.00(3)(b)(i), 80.05(1).

The New York State Board of Elections, whose members and co-executive directors are sued here in their official capacities, is a bipartisan agency responsible for enforcing New York's election laws, including the Line Warming Ban.  N.Y. Elec. Law §§ 3-102, 3-104, 3-107.  (Pl. FFCL ¶ 3).

The New York City Board of Elections, whose members are sued here in their official capacities, is a bipartisan administrative body composed of commissioners appointed by the City Council of the City of New York.  N.Y. Elec. Law § 3-200(3).  Among other things, the City Board is tasked with administering elections and operating poll sites within New York City.  *See id.* §§ 3-400(9), 3-402.  (Pl. FFCL ¶ 10).  The City Board is also responsible for enforcing New York's election laws, including the Line Warming Ban, at the polling sites it manages.  (*Id.* ¶ 11).

Both the State and City Boards have the power to make criminal referrals for violations of election laws.  (Pl. FFCL ¶¶ 7, 12).  New York also grants the State Board authority to "appoint a special investigator to take charge of the investigation of cases arising under the election law," who "shall have all of the powers of a peace officer as set forth in section 2.20 of the criminal procedure law, for the purpose of enforcing the provisions of this chapter."  (*Id.* ¶ 6 (quoting N.Y. Elec. Law § 3-107)).

The City Board's Executive Director, Michael Ryan, typically learns about issues at New York City poll sites through complaints or direct reports from poll workers or monitoring teams that are employed by the Board of Elections.  (Pl. FFCL ¶ 17).  Since he has been Executive Director of the City Board, Mr.

Ryan has neither received a complaint regarding food and drink being distributed on voting lines nor personally observed individuals distributing food or drink to voters at the polls.  (*Id.* ¶¶ 18-19).  Similarly, Thomas Connolly, the Deputy Executive Director of the State Board, has never personally observed any conduct that would constitute a violation of the Line Warming Ban.  (*Id.* ¶ 20).  Nor has Mr. Connolly been contemporaneously aware of any distribution of food and water at the polls in New York.  (*Id.*).

Relevant here, neither the State Board nor the City Board has disavowed enforcement of the Line Warming Ban.  (Pl. FFCL ¶ 21).  Indeed, Mr. Connolly testified that the Ban is necessary because removing it would "take[] away [the State Board of Elections'] ability to have some standing in trying to provide that zone of repose for the voter."  (*Id.* (quoting Trial Tr. 166:12-19)).  And the State Board's counsel similarly described the Ban as "an important arrow in [the State Board of Elections'] quiver to prevent some more offensive conduct."  (*Id.* (quoting Trial Tr. 11:11-14)).

## B.    Voting Lines in New York

The issue of long wait times to vote has for many years been a topic of discussion in New York.  (Pl. FFCL ¶ 30).  While New York law ideally seeks to ensure that voters do not wait more than thirty minutes to cast their ballots (*Id.* ¶ 23 (citing N.Y. Elec. Law § 3-400(9); 9 N.Y.C.R.R. §§ 6210.19(c)(3), 6210.19(d)(1), 6211.1(b)(2))), state and city officials have reported wait times significantly longer than thirty minutes, particularly in high turnout

presidential election years — sparking concerns of long lines in the forthcoming 2024 presidential election.  (*Id.* ¶¶ 23, 32).

While the State Board has received complaints from voters about long wait times dating back more than a decade (Pl. FFCL ¶ 24), long voting lines came to the fore during early voting in 2020 — the first presidential election for which early voting was available in New York (*id.* ¶ 25).  Indeed, during the fall of 2020, the New York Attorney General reported receiving "a large volume of complaints from voters in counties across the State who have waited in long lines to cast their ballots, in some cases for as many as five hours."  (*Id.* ¶ 26 (quoting Pl. Ex. 34)).  Long lines and extended wait times may provide an impediment to voting, as they have the potential to discourage voters from remaining at the polls to cast their vote.

## C.    Plaintiff's Mission and Activities

Plaintiff is a nonpartisan organization dedicated to "remov[ing] all barriers of racial discrimination through democratic processes, educat[ing] voters on their constitutional rights, and tak[ing] all lawful action to secure the exercise of those rights."  (Pl. FFCL ¶ 36 (quoting Williams Decl. ¶ 3)).  For years, Plaintiff has engaged in "voter outreach, education, and activism" to improve access to the franchise.  (*Id.* (quoting Williams Decl. ¶ 4)).  These efforts include, among other things, in-person outreach activities, voter education programs, and "Get Out the Vote" rallies aimed at encouraging voters to exercise their right to vote.  (*Id.* ¶¶ 38-40).  During such events,

Plaintiff often provides food and entertainment, accompanied by NAACP-branded signage and literature. (*Id.* ¶¶ 37, 42, 44).

Long voting lines are contrary to Plaintiff's mission of expanding the franchise. Long voting lines at the polls are a particular concern in the communities of color that Plaintiff serves, which communities have historically suffered disproportionately longer wait times. (Pl. FFCL ¶ 45). Indeed, Plaintiff has been aware of complaints about long lines in Brooklyn, other parts of New York City, and upstate communities at every general election since at least 2012. (*Id.*).

In light of this reality, Plaintiff discussed, as early as 2012, ways to support voters waiting in line, including by providing food and drink. (Pl. FFCL ¶ 46). However, Plaintiff asserts that the Line Warming Ban has thus far prevented it from engaging in these activities for fear of prosecution thereunder. (*Id.* ¶ 53). Indeed, Plaintiff testifies that, if not for the Line Warming Ban, Plaintiff and its members and volunteers "would provide sundries such as bottled water, granola bars, donuts, potato chips, or pizza to voters already waiting in the long lines." (*Id.* ¶ 54 (quoting Williams Decl. ¶ 32)). By doing so, Plaintiff asserts that it seeks to convey "the importance of voting, and emphasize that everyone's vote counts." (*Id.* ¶ 52 (quoting Williams Decl. ¶¶ 33, 38)). Importantly, Plaintiff represents that its provision of this support would not implicate partisan activities, including electioneering or other forms of campaigning. (*Id.* ¶¶ 58, 59).

## CONCLUSIONS OF LAW

Plaintiff challenges the constitutionality of the Line Warming Ban on three independent bases: *first*, that it impermissibly restricts expressive conduct protected by the First Amendment; *second*, that it is facially overbroad in violation of the First Amendment; and *third*, that it is facially vague in violation of the Due Process Clause of the Fourteenth Amendment.

The Court has largely set forth the legal framework for this case in *Kosinski I. See* 657 F. Supp. 3d at 514-35.  In that Opinion, the Court concluded that the facts alleged in the Amended Complaint, taken as true, established that (i) Plaintiff had standing to pursue this action; (ii) "line warming," as Plaintiff intends to conduct it, was "expressive conduct" subject to First Amendment protection; (iii) Section 17-140 was a content-based restriction on speech insufficiently tailored to survive either strict or intermediate scrutiny; and (iv) the Ban was facially overbroad and potentially vague.  *Id.*  Applying this framework to the facts proven during trial — which facts largely replicate those alleged in the pleadings — requires judgment in favor of Plaintiff.

## A.    Plaintiff Has Article III Standing to Challenge the Line Warming Ban

As in their prior motion practice, Defendants press the Court to consider the threshold issue of whether Plaintiff has standing to pursue its claims before considering the merits of those claims.  The Court finds that Plaintiff does.

Federal courts have limited jurisdiction, "and lack the power to disregard such limits as have been imposed by the Constitution or Congress."  *Platinum-*

*Montaur Life Scis., LLC* v. *Navidea Biopharms., Inc.*, 943 F.3d 613, 616 (2d Cir. 2019) (internal quotation marks and citation omitted).  Article III of the U.S. Constitution "limits the jurisdiction of federal courts to 'Cases' and 'Controversies,'" thereby "restrict[ing] the authority of federal courts to resolving 'the legal rights of litigants in actual controversies[.]'" *Genesis Healthcare Corp.* v. *Symczyk*, 569 U.S. 66, 71 (2013) (quoting *Valley Forge Christian Coll.* v. *Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982)).  The "Case" or "Controversy" requirement means that only those disputes that meet the "irreducible constitutional minimum" of standing can be heard in a federal forum.  *Lujan* v. *Defs. of Wildlife*, 504 U.S. 555, 560 (1992); *see also Warth* v. *Seldin*, 422 U.S. 490, 498 (1975) (explaining that standing is a "threshold question in every federal case, determining the power of the court to entertain the suit").

To establish standing, a federal plaintiff must prove (i) an "injury in fact," constituting an "invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical"; (ii) "a causal connection between the injury and the conduct complained of"; and (iii) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Lujan*, 504 U.S. at 560-61 (internal quotation marks and citations omitted).  In this case, while the Brooklyn NAACP is an organizational plaintiff, it may still "independently satisfy the requirements of Article III standing," and thus sue in its own right. *Knife Rts., Inc.* v. *Vance*, 802 F.3d 377, 388 (2d Cir. 2015); *see also Havens*

*Realty Corp.* v. *Coleman.*, 455 U.S. 363, 379 n.19 (1982); *N.Y. C.L. Union* v. *N.Y.C. Transit Auth.*, 684 F.3d 286, 295 (2d Cir. 2012) (explaining that an organization may sue to "vindicate its own rights" by "establish[ing] that it (through its agents) suffered a concrete injury").

### 1.    Plaintiff Established an "Injury in Fact" Sufficient to Confer Article III Standing

Defendants first challenge the "injury in fact" component of Plaintiff's standing.  Specifically, Defendants contend that Plaintiff's injury is unduly speculative because (i) it has "no concrete plans" to engage in line warming and (ii) it "cannot prove a credible fear of prosecution" under the Line Warming Ban because the Ban lacks a history of enforcement.  (Def. Br. 4-9).  The Court disagrees on both counts.

Where, as here, a party "seeks review of a prohibition prior to its being enforced," "'somewhat relaxed standing' rules apply." *Centro de la Comunidad Hispana de Locust Valley* v. *Town of Oyster Bay*, 868 F.3d 104, 110-11 (2d Cir. 2017) (quoting *Nat'l Org. for Marriage, Inc.* v. *Walsh*, 714 F.3d 682, 689 (2d Cir. 2013)).  This makes particular sense in the context of First Amendment pre-enforcement challenges, where plaintiffs "'face an unattractive set of options if they are barred from bringing a facial challenge': refraining from activity they believe the First Amendment protects, or risk civil or criminal penalties for violating the challenged law." *Walsh*, 714 F.3d at 689 (citing *Fla. League of Prof'l Lobbyists, Inc.* v. *Meggs*, 87 F.3d 457, 459 (11th Cir. 1996)).

While a plaintiff must generally show a "substantial risk" of injury, or a "certainly impending" threat of injury to satisfy the injury in fact element based

on future harm, *Susan B. Anthony List* v. *Driehaus*, 573 U.S. 149, 158 (2014), in the pre-enforcement context, a plaintiff can establish injury by demonstrating its "intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute," for which "there exists a credible threat of prosecution thereunder," *Babbitt* v. *United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979); *see also Susan B. Anthony List*, 573 U.S. at 159.

Here, Plaintiff satisfies both *Babbitt* conditions. *First*, Plaintiff has demonstrated its intention to engage in conduct violative of the Line Warming Ban. *See Babbitt*, 442 U.S. at 298. To that end, Plaintiff has presented testimony describing in detail the line warming activities that it and its members intend to engage in should its action be successful. Plaintiff's President L. Joy Williams credibly testified that "[b]ut for the Ban, [Plaintiff]'s members and volunteers would provide sundries such as bottled water, granola bars donuts, potato chips, or pizza to voters" waiting in line at polling places in New York during voting hours. (Williams Decl. ¶ 32; *see also* Trial Tr. 88:17-22). The Chair of the Civic Engagement Committee, Joan Alexander Bakiriddin, further explained that Plaintiff plans to target polling locations that have experienced long wait times in recent election cycles, and for which locations long wait times can be expected in connection with the upcoming 2024 election. (Bakiriddin Decl. ¶ 22). While a future injury is not cognizable if it depends on a "speculative chain of possibilities," the testimony from Plaintiff's officers, considered as a whole, clearly establishes there are no

14

preconditions to its intent to engage in line warming, save the Line Warming
Ban itself. *Clapper* v. *Amnesty Int'l USA*, 568 U.S. 398, 414 (2013) , 568 U.S.
at 414; *cf. Faculty* v. *N.Y. Univ.*, 11 F.4th 68, 77 (2d Cir. 2021) (finding no
standing where "uncertain future action would need to occur before the
plaintiff[] could arguably suffer the harm alleged").

Such planned activity is consistent with Plaintiff's long history of
engagement efforts to support all voters in gaining access to the franchise,
including providing other forms of support to voters waiting in long lines.
(Williams Decl. ¶ 11; *see also* Trial Tr. 18:18-20). For example, during the
2020 early voting period, Plaintiff members and volunteers provided
entertainment, face masks, hand sanitizer, non-partisan information, and
moral support to voters waiting in long lines at a polling site at Brooklyn's
Barclays Center. (Pl. Ex. 8; Williams Decl. ¶¶ 21-22; Bakiriddin Decl. ¶ 14;
Trial Tr. 39:16-18, 134:20-135:3). This history of engagement, coupled with
Plaintiff's fully articulated intent to support voters in upcoming elections,
including the 2024 presidential election, establishes that the organization
stands "able and ready" to engage in the prohibited conduct "in the reasonably
imminent future," and is not simply seeking to bring this action out of "a desire
to vindicate [its] view of the law." *Carney* v. *Adams*, 592 U.S. 53, 63-64 (2020).
(*See* Bakiriddin Decl. ¶ 22 (detailing Plaintiff's active discussions regarding
those financial and volunteer resources it will need to support voters in

preparation for upcoming elections if successful in this lawsuit); Williams Decl. ¶ 38 (same)).[2]

*Second*, Plaintiff has demonstrated that it faces a credible threat that the Ban will be enforced against it.  *See Babbitt*, 442 U.S. at 298.  The credibility of a threat of prosecution "necessarily depends on the particular circumstances at issue."  *Knife Rts.*, 802 F.3d at 384.  As discussed above, however, a plaintiff need not expose herself to liability to establish that a threat of prosecution is credible.  *Id.* (citing *MedImmune, Inc.* v. *Genentech, Inc.*, 549 U.S. 118, 128-29 (2007) (collecting cases)); *see also N.H. Right to Life Pol. Action Comm.* v. *Gardner*, 99 F.3d 8, 13-14 (1st Cir. 1996) ("[I]t is not necessary that a person expose herself to arrest or prosecution under a statute in order to challenge that statute in a federal court."); *Roe* v. *City of New York*, 151 F. Supp. 2d 495, 503 (S.D.N.Y. 2001) ("[T]here is no *per se* rule requiring more than one past act, or any prior act, for that matter, as a basis for finding a likelihood of future injury.").  This rationale holds true "even if there is no history of past enforcement," for as long as the statute remains, the credible threat of future enforcement is sufficient to confer standing.  *N.H. Right to Life*, 99 F.3d at 13.

This is especially true in the First Amendment context, where the threat to a plaintiff's freedom of speech is "latent in the existence of the statute," such

---

[2]     The facts that (i) Plaintiff has not "set aside resources" to engage in line warming and (ii) discussion of Section 17-140 is not reflected in meeting minutes of Plaintiff's executive committee do not change the Court's conclusion.  (Def. Br. 5).  There is no requirement that such plans be reduced to writing and Plaintiff need not support an intent with a "formal" plan where doing so would be a "futile gesture."  *Carney* v. *Adams*, 592 U.S. 53, 66 (2020).

that a plaintiff need not show specific threats of prosecution to establish that her free speech rights have been limited.  *Majors* v. *Abell*, 317 F.3d 719, 721 (7th Cir. 2003); *see also Ctr. for Individual Freedom* v. *Carmouche*, 449 F.3d 655, 660 (5th Cir. 2006) ("Controlling precedent … establishes that a chilling of speech because of the mere existence of an allegedly vague or overbroad statute can be sufficient injury to support standing." (citing *Dombrowski* v. *Pfister*, 380 U.S. 479, 486-87 (1965); *Virginia* v. *Am. Booksellers Ass'n*, 484 U.S. 383, 392 (1988))).

In this context, it is Defendants' burden to show that the Ban will not be enforced against Plaintiff or its members.  *See Vitagliano* v. *Cnty. of Westchester*, 71 F.4th 130, 138 (2d Cir.) ("[W]here a statute specifically proscribes conduct, the law of standing does not place the burden on the plaintiff to show an intent by the government to enforce the law against it." (quoting *Tweed-New Haven Airport Auth.* v. *Tong*, 930 F.3d 65, 71 (2d Cir. 2019))), *cert. denied sub nom. Vitagliano* v. *Cnty. of Westchester, New York*, 144 S. Ct. 486 (2023).  Indeed, courts are "quite forgiving" to plaintiffs seeking pre-enforcement review and are "willing to presume that the government will enforce the law … in the absence of a disavowal by the government or another reason to conclude that no such intent existed."  *Hedges* v. *Obama*, 724 F.3d 170, 197 (2d Cir. 2013).

The facts as presented at trial clearly establish that Defendants cannot meet their burden.  For one, despite the lack of enforcement history, Defendants have not disavowed enforcement of the Ban.  *See Cayuga Nation* v.

*Tanner*, 824 F.3d 321, 331-32 (2d Cir. 2016) (finding a credible threat of prosecution where there was "reason to believe that the plaintiffs will be targets of criminal prosecution, and there has been no disavowal of an intention to prosecute those individuals"); *see also Susan B. Anthony List*, 573 U.S. at 165 (listing absence of disavowal by government as further support of credible threat).[3]

The Supreme Court's analysis in *Babbitt* v. *United Farm Workers National Union*, where the Court found standing to bring a First Amendment challenge to a statute that had never been enforced, is instructive here.  *Babbitt*, 442 U.S. at 301.  Indeed, the *Babbitt* Court found the matter justiciable even though the statute's criminal provision "ha[d] not yet been applied and may never be applied," to prohibit certain types of allegedly deceptive statements pertaining to unfair labor practices.  *Id.* at 302.  Pertinent to this case, the Court found that because "the State ha[d] not disavowed any intention of invoking the criminal penalty provision," the plaintiffs' fear of prosecution was "not without some reason[.]"  *Id.*  By contrast, in *Brown* v. *Buhman*, the Tenth Circuit held that the plaintiffs' challenge to Utah's anti-bigamy statute became moot, in part, because the defendant, the County Attorney for Utah County, "declared under penalty of perjury that the [plaintiffs] will not be prosecuted

---

[3]   Although courts often look to a statute's enforcement history as evidence that the threat of enforcement is substantial, courts have never deemed such history necessary to show a credible threat.  *See Antonyuk* v. *Chiumento*, 89 F.4th 271, 334 (2d Cir. 2023) ("While evidence that a plaintiff faced either previous enforcement actions or a stated threat of future prosecution is, of course, relevant to assessing the credibility of an enforcement threat, none of these cases suggest that such evidence is *necessary* to make out an injury in fact." (quoting *Vitagliano* v. *Cnty. of Westchester*, 71 F.4th 130, 139 (2d Cir. 2023) (alteration adopted)).

unless they engage in criminal conduct beyond that proscribed by the Statute." 822 F.3d 1151, 1170 (10th Cir. 2016).

Unlike the defendant in *Buhman*, the authorities tasked with enforcing the Line Warming Ban have not disavowed its enforcement. Quite the opposite: During trial, Mr. Connolly testified that the Line Warming Ban continues to serve an important purpose, and that its removal would "take[] away [the State Board's] ability to have some standing in trying to provide that zone of repose for the voter." (Trial Tr. 166:12-19). Indeed, and consistent with the Court's earlier discussion regarding the appropriateness of standing for pre-enforcement challenges, Mr. Connolly explained that "just the fact that it is against the law" is enough to allow county boards to dissuade would-be violators from engaging in line warming in the first place. (*Id.* at 164:21-165:9).

Ultimately, Defendants' characterization of the statute undermines their standing argument. Defendants simultaneously claim that Plaintiff lacks standing to challenge the Ban because it is unlikely to be enforced against them, *and* that the Line Warming Ban's mere existence allows election officials to effectively deter unwanted actors from engaging in line warming. (*Compare* Trial Tr. 166:3-7 (Connolly) (testifying that "just having the law in place and having the ability to rely on it is effective without it actually resulting in any prosecutions"), *with* Def. FFCL ¶ 10 ("There is … no evidence to support Plaintiff's allegation that the presence of Section 17-140 on the books is what 'chilled' it from engaging in the Proposed Conduct.")).

In short, absent disavowal, Defendants have failed to overcome the presumption that New York will not enforce the Ban.  *See Antonyuk* v. *Chiumento*, 89 F.4th 271, 334 (2d Cir. 2023) (stating that intent by the government to enforce the law is presumed "in the absence of a disavowal by the government"); *see also Barilla* v. *City of Houston*, 13 F.4th 427, 433 (5th Cir. 2021) (finding a substantial threat of enforcement where "the [defendant] did not disclaim its intent to enforce the [challenged ordinances] to the district court, in its appellate briefing, or during oral argument, and instead stressed the Ordinances' legitimacy and necessity").

Nor have Defendants convincingly demonstrated that the Ban — which was amended as recently as 1992 — is moribund or of merely historical curiosity.  *See Poe* v. *Ullman*, 367 U.S. 497, 501-02 (1961) (citing the "ubiquitous, open, public sales" of contraceptives with no enforcement activity as evidence that the threat of prosecution was insufficient to confer standing); *see also Johnson* v. *District of Columbia*, 71 F. Supp. 3d 155, 159-60 (D.D.C. 2014) (finding that the "conventional background expectation of enforcement may be overcome where the law is moribund or of purely historical curiosity" (quotations omitted, collecting cases)).

The moribund statute exception is narrow, as courts are appropriately wary of requiring plaintiffs to commit criminal acts in order to obtain standing, especially given the real possibility that authorities may take renewed interest in prosecuting conduct that had historically been tolerated.  *See Kosinski I*, 657 F. Supp. 3d at 519-20 (recognizing that shortly after the Court, in *Poe* v.

*Ullman*, found the plaintiff's "risk of prosecution incredible based on a lack of historical prosecutions," Connecticut authorities commenced a prosecution under the exact same statute, leading to its invalidation in *Griswold* v. *Connecticut*, 381 U.S. 479 (1965)).  Accordingly, to satisfy the exception requires a showing by Defendants that "the relevant provisions have been 'commonly and notoriously' violated."  *S.F. Cnty. Democratic Cent. Comm.* v. *Eu*, 826 F.2d 814, 822 (9th Cir. 1987) (quoting *Poe*, 367 U.S. at 502).  This makes sense, as absent evidence of "open and notorious" violations of the challenged statutes, courts "cannot assume the State's acquiescence in violations of the law."  *Bryant* v. *Woodall*, 1 F.4th 280, 286 (4th Cir. 2021).

Here, Defendants fail to provide sufficient evidence of "open and notorious" violations of the statue.  Neither Mr. Connolly nor Mr. Ryan — both experienced elections officials — has ever witnessed any distribution of food or drink at the polls.  (Trial Tr. 101:4-11 (Ryan); *id.* at 158:8-13 (Connolly)).  And neither the State Board nor the City Board has ever received a complaint or official report of line warming activity.  (*Id.* at 101:15-23, 102:18-21 (Ryan); *id.* at 158:8-22 (Connolly)).  Defendants instead identify two organizations, "Pizza to the Polls" and "Chefs to the Polls," which they allege were engaged in distributing food items near polling stations as evidence of possible violations.  (Def. Br. 8).  However, even if election officials were contemporaneously aware of these organizations' activities during the 2020 election — a fact that is

unsupported by the record[4] — a handful of discrete examples from 2020 are insufficient to demonstrate that violations of the Ban are "ubiquitous" or "common[]."  *Poe*, 367 U.S. at 501-02; *Eu*, 826 F.2d at 822.

Defendants' argument that the statute is "moribund" also exists in direct tension with their characterization of the Ban as necessary to achieve compelling state interests.  Defendants maintain that the Line Warming Ban is necessary to further an important state interest of "prevent[ing] some more offensive conduct."  (Trial Tr. 11:11-14 (Hallak)).  Of course, a truly moribund statute can neither chill nor deter.  (*Compare* Def. Br. 9 (arguing the threat of enforcement is "merely 'chimerical'"), *with id.* at 17 (explaining the Ban's necessity)).

In conclusion, because Plaintiff has established (i) an "intention to engage in a course of conduct arguably affected with a constitutional interest," that is (ii) undisputedly "proscribed by" the Line Warming Ban, and (iii) that "there exists a credible threat of prosecution thereunder," it has demonstrated an injury in fact under *Babbitt*.  442 U.S. at 298.

## 2. Plaintiff Satisfies the Remaining Elements of Standing

As a fallback position, Defendants argue that Plaintiff cannot satisfy the remaining elements of standing — that any alleged injury is traceable to an action by the Defendants and would be redressed by a favorable decision.  (Def. Br. 9-11).  Specifically, Defendants contend that they have "no jurisdiction to

---

[4]    For example, Mr. Connolly testified that, to his knowledge, neither he nor anybody else at the State Board was aware of Pizza to the Polls' activities in New York when they were occurring in 2020.  (Trial Tr. 158:23-159:4 (Connolly)).

enforce or prosecute" a violation of Section 17-140.  (*Id.* at 10).  The Court disagrees.

The requirements of traceability and redressability "often travel together." *Support Working Animals, Inc.* v. *Governor of Fla.*, 8 F.4th 1198, 1201 (11th Cir. 2021) (citing 13A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 3531.5 (3d ed. 2021)).  Traceability requires that the injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court."  *Lujan*, 504 U.S. at 560 (alterations adopted).  This requirement "does not create an onerous standard."  *Ateres Bais Yaakov Acad. of Rockland* v. *Town of Clarkstown*, 88 F.4th 344, 352-53 (2d Cir. 2023).  For example, "[a] defendant's conduct that injures a plaintiff but does so only indirectly, after intervening conduct by another person, may suffice for Article III standing."  *Carter* v. *HealthPort Techs., LLC*, 822 F.3d 47, 55-56 (2d Cir. 2016).  Likewise, a plaintiff can show traceability where the injury suffered is "produced by [the] determinative or coercive effect" of the defendant's conduct "upon the action of someone else."  *Bennett* v. *Spear*, 520 U.S. 154, 169 (1997).

To satisfy the redressability element of Article III standing, "a plaintiff must show that it is 'likely, as opposed to merely speculative, that the alleged injury will be redressed by a favorable decision.'"  *Soule* v. *Conn. Ass'n of Schs., Inc.*, 90 F.4th 34, 47 (2d Cir. 2023) (*en banc*) (quoting *Lujan*, 504 U.S. at 561) (internal alteration omitted).  "A plaintiff makes this showing when the relief sought 'would serve to … eliminate any effects of' the alleged legal violation that

produced the injury in fact." *Id.* (quoting *Steel Co.* v. *Citizens for a Better Env't*, 523 U.S. 83, 105-06 (1998)).  Article III therefore requires only that a judgment in favor of Plaintiff "'would at least partially redress' the alleged injury." *Id.* at 48 (quoting *Meese* v. *Keene*, 48 U.S. 465, 476 (1987)).

In this case, the powers and obligations of the State and City Boards suffice to establish that both entities are the proper defendants here — and thus that traceability and redressability are satisfied.  The State and City Boards are charged, under New York law, with investigating and referring violations of the Line Warming Ban.  This duty is recognized in the State Board's mission to ensure the integrity of the electoral process in the State of New York, to provide oversight of County Boards of Elections, and to enforce state and federal laws as they pertain to elections.  (Trial Tr. 151:1-18).  New York law further grants the State Board authority to "appoint a special investigator" to take charge of the investigation of cases "arising under the election law," N.Y. Elec. Law § 3-107; gives the State Board the responsibility of directing county boards, one of which is the City Board, to use their "[e]nforcement powers" to "prevent violations of the election process" (Pl. Ex. 27); and empowers the State and City Boards to make criminal referrals for violations of election laws (Trial Tr. 152:2-9; Connolly Decl. ¶ 44).  Altogether, it is each Board's mandate to enforce the Line Warming Ban that provides a "sufficient connection to the enforcement of the challenged statute," for the purposes of traceability and redressability.  *Frank* v. *Lee*, 84 F.4th 1119, 1135 (10th Cir. 2023) (finding the Secretary of State and County Clerk were the

"proper state officials for suit" challenging Wyoming election law, as "[t]hey are the chief elections officials responsible for ensuring compliance with the elections laws and they have authority to refer violators for prosecution").[5]

Contrary to Defendants' assertion, the dearth of evidence that the State Board has ever used its investigative and referral powers to ensure compliance with the Ban is immaterial.  (Def. Br. 9).  A plaintiff need only show that the named defendant has *some* enforcement authority — not that the defendant has used that authority.  *See Support Working Animals, Inc.*, 8 F.4th at 1201 ("[W]here, as here, a plaintiff has sued to enjoin a government official from enforcing a law, he must show, at the very least, that the official has the authority to enforce the particular provision that he has challenged[.]").[6]

In sum, the First Amendment chill that Plaintiff allegedly suffers as a result of the Line Warming Ban is traceable to both sets of Defendants.  And the declaratory and injunctive relief that Plaintiff seeks here "would at least

---

[5]  That the State Board lacks the ultimate authority to prosecute is beside the point where it has statutory authority to investigate and refer violations for prosecution.  (Def. Br. 9-10).  The State Board's chief enforcement counsel has authority "to investigate on his or her own initiative or upon complaint alleged violations" of New York election law, after which the State Board's commissioners would conduct a vote to determine whether there is "reasonable cause to believe that a violation warranting criminal prosecution has taken place."  (*Id.* at 9-10 (citing N.Y. Elec. Law § 3-104) (alterations adopted)).  If the commissioners vote that there is such cause, then the State Board's chief enforcement counsel must "refer such matter to the attorney general or district attorney with jurisdiction over such matter to commence a criminal action."  (*Id.* at 10 (citing N.Y. Elec. Law § 3-104(5)(b) (alterations adopted)).

[6]  For the same reason, the fact that a judgment against Defendants "would only bind them," and not any other non-party governmental officials or entities, is meritless.  (Def. Br. 11).  Notwithstanding the fact that a finding in favor of Plaintiff would necessarily enjoin all enforcement of the statute, Plaintiff is injured at least in part due to Defendants' powers to enforce the Ban.  *See Soule* v. *Conn. Ass'n of Schs., Inc.*, 90 F.4th 34, 48 (2d Cir. 2023) (*en banc*) (finding redressability because a judgment in favor of plaintiff "'would at least partially redress' the alleged injury."  (*quoting Meese* v. *Keene*, 481 U.S. 465, 476 (1987))).

partially redress" its injury, as it would preclude Defendants from enforcing the Line Warming Ban against Plaintiff.  *Meese*, 481 U.S. at 476.  Accordingly, Plaintiff has Article III standing.

## B.    The Line Warming Ban Violates the First Amendment

Having determined that Plaintiff's action is not barred by issues of standing, the Court now turns to the merits of the parties' arguments.  In particular, Plaintiff contends that line warming is expressive conduct entitled to protection under the First Amendment and, further, that the Line Warming Ban impermissibly denies it such protection.  (AC ¶¶ 38-44).  For the reasons set forth in the remainder of this section, the Court agrees with Plaintiff's position.

### 1.    Line Warming Is Expressive Conduct

The First Amendment provides in relevant part that "Congress shall make no law ... abridging the freedom of speech[.]"  U.S. Const. amend. I.  It is incorporated against the states through the Due Process Clause of the Fourteenth Amendment.  *Gitlow* v. *New York*, 268 U.S. 652, 666 (1925).

The Constitution's protection for freedom of speech "does not end at the spoken or written word," *Texas* v. *Johnson*, 491 U.S. 397, 404 (1989), but rather extends to symbolic or expressive conduct, *Church of Am. Knights of the Ku Klux Klan* v. *Kerik*, 356 F.3d 197, 205 (2d Cir. 2004).  In particular, conduct is entitled to constitutional protection if it is "sufficiently imbued with elements of communication[.]"  *Johnson*, 491 U.S. at 404 (quoting *Spence* v. *State of Washington*, 418 U.S. 405, 409 (1974)).  To establish that conduct is

26

expressive, a plaintiff must show both (i) "an intent to convey a 'particularized message'" and (ii) "a great likelihood that the message will be understood by those viewing it." *Zalewska* v. *Cnty. of Sullivan*, 316 F.3d 314, 319 (2d Cir. 2003) (quoting *Johnson*, 491 U.S. at 404).

To satisfy this test, an activity need not communicate "a narrow succinctly articulable message." *Hurley* v. *Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569 (1995); *see also Jian Zhang* v. *Baidu.com Inc.*, 10 F. Supp. 3d 433, 437-38 (S.D.N.Y. 2014) ("[T]he First Amendment's protections apply whether or not a speaker articulates, or even has, a coherent or precise message, and whether or not the speaker generated the underlying content in the first place."). Rather, the law tolerates some variation in how a message is communicated and perceived: "a private speaker does not forfeit constitutional protection simply by combining multifarious voices, or by failing to edit their themes to isolate an exact message as the exclusive subject matter of the speech." *Hurley*, 515 U.S. at 569-70.

Applying this precedent, the Court holds that by engaging in line warming, Plaintiff would engage in protected expressive conduct. *First*, Plaintiff intends to communicate a message through line warming — that voting is important. Specifically, by giving food and drink to voters, Plaintiff intends "to convey the importance of [voters] staying in line, the importance of voting, and to emphasize that everyone's vote counts." (Williams Decl. ¶ 33; *see also* Trial Tr. 50:12-15 (Williams); Bakiriddin Decl. ¶ 23 (describing Plaintiff's intent to communicate to voters "that they have support from NAACP volunteers" and its

"hope that message encourages voters to exercise" their right to vote)).  This message is sufficiently "particularized" to warrant First Amendment protection. *Cf. Zalewska*, 316 F.3d at 320 (deeming plaintiff's attempt to communicate "cultural values" by wearing a skirt was too "vague" to constitute protected expressive conduct); *E. Hartford Educ. Ass'n* v. *Bd. of Educ.*, 562 F.2d 838, 857-58 (2d Cir. 1977) (finding refusal to wear a necktie because it conveyed a message of non-conformity and a rejection of older traditions to be "sufficiently vague" as to not constitute expressive conduct).

*Second*, Plaintiff's message will likely be understood by those viewing it, in the context in which it is received.  *Cf. Spence*, 418 U.S. at 410 (noting that "the context in which a symbol is used for purposes of expression is important, for the context may give meaning to the symbol").  Factors such as the location and timing of expressive conduct are relevant to how that conduct is likely to be perceived.  *See, e.g.*, *Lebowitz* v. *City of New York*, 606 F. App'x 17, 17-18 (2d Cir. 2015) (summary order) (finding that protestors' act of lying down in public park was expressive "under the circumstances"); *cf. Spence*, 418 U.S. at 410 (finding that superimposing a peace symbol on flag communicated a message of protest because the display was "roughly simultaneous with" invasion of Cambodia and the Kent State shooting).  That Plaintiff intends to engage in line warming at polling places during voting hours is context that links the organization's conduct (providing food and drink to voters) to its intended message (that voting is important).

The Court's conclusion is further reinforced by applying the multi-factor test set forth by the Eleventh Circuit in *Fort Lauderdale Food Not Bombs* v. *City of Fort Lauderdale* to determine whether food sharing constitutes conduct that is likely to be perceived as expressing a message.  901 F.3d 1235 (11th Cir. 2018).  In *Food Not Bombs*, the Eleventh Circuit concluded that a nonprofit's distribution of food in a public park was protected by the First Amendment because a reasonable person would understand the event to convey an anti-hunger message.  *Id.* at 1238-42.  In arriving at that conclusion, the court considered five factors: (i) the nonprofit set up tables and banners and distributed literature at its events; (ii) its food sharing events were open to everyone and all were invited to participate and share in the meal; (iii) the events were held in a traditional public forum; (iv) the subject of the intended message related to an "issue of concern in the community," and (v) the means of conveying the message — sharing food — had a "significance" that "dates back millennia."  *Id.* at 1242-43.

While not binding on this Court, the same "contextual clues" present in *Food Not Bombs* are present here.  *First*, as at past volunteer events, Plaintiff's members, identifiable by t-shirts and jackets bearing the organization's logo, plan to pair food and drink sharing with literature and signage.[7]  (Williams

---

[7]     Defendants assert that Plaintiff improperly seeks to rely on written materials to establish the expressive nature of line warming.  (Def. 13).  *See, e.g.*, *Rumsfeld* v. *FAIR*, 547 U.S. 47 (2006) (finding that law schools "expressed" their disagreement with the military by treating military recruiters differently from other recruiters was only expressive because the law schools accompanied their conduct with speech explaining it).  Unlike the law schools' conduct in *FAIR*, for which a reasonable observer would likely require "explanatory speech" to infer that the communication of any message, here, "the expressive component of [Plaintiff's] actions is [] created by the conduct

Decl. ¶¶ 10, 37; Bakiriddin Decl. ¶ 22).  *See Hurley*, 515 U.S. at 570 (holding that participation in a parade was expressive in part because group members "distributed a fact sheet describing the members' intentions" and held banners while they marched).  *Second*, Plaintiff's line warming support will be open to all voters waiting in lines outside of their polling place.  (Williams Decl. ¶ 35). That is, the events are "open to everyone."  *Food Not Bombs*, 901 F.3d at 1242. *Third*, Plaintiff's planned activity will take place in voting lines on public streets outside polling places — a traditional public forum.  *See Burson* v. *Freeman*, 504 U.S. 191, 196-97 (1992) ("Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens." (internal quotation marks and citation omitted)) (plurality op.).  *Fourth*, long wait times at polls in New York is an "issue of concern in the community," as demonstrated by the voluminous complaints regarding long wait times from voters and community advocates.  *Food Not Bombs*, 901 F.3d at 1243.  *Fifth*, historical context shows that sharing food is a form of expression.  As the Eleventh Circuit recognized, "[l]ike the flag, the significance of sharing meals with others dates back millennia."  *Id.*  "Both the long history

---

itself."  *Id.* at 66.  Brooklyn NAACP's message of the importance of voting is intrinsic to its actions of gifting food and drink.

Defendants further assert that the literature Plaintiff has identified, which includes materials Plaintiff has distributed during different "Get Out The Vote" activities, "does not convey the same message that Plaintiff[] purports to have intended to convey."  (Def. Br. 13).  This is inconsequential.  It does not matter whether the literature spells out the precise message Plaintiff intends to convey.  *See Fort Lauderdale Food Not Bombs* v. *City of Fort Lauderdale*, 901 F.3d 1235, 1244 (11th Cir. 2018) ("Whether those banners said 'Food Not Bombs' or 'We Eat With the Homeless' adds nothing of legal significance to the First Amendment analysis.").

of significant meal sharing and what those meals conveyed — messages of inclusion and gratitude — put an observer on notice of a message from a shared meal." *Burns* v. *Town of Palm Beach*, 999 F.3d 1317, 1345 (11th Cir. 2021). In short, taken together, these factors demonstrate that, in context, a reasonable observer is likely to perceive Plaintiff's line warming activities as expressing some sort of message.

Indeed, two federal district courts, faced with similar factual records, have reached the same conclusion. Applying the *Food Not Bombs* factors, a Georgia district court concluded that line warming activity similar to what Plaintiff intends here is expressive. *See In re Ga. Senate Bill 202*, No. 21 Civ. 1229 (JPB), 2023 WL 5334617, at *7-8 (N.D. Ga. Aug. 18, 2023) ("*S.B. 202 II*"); *see also In re Georgia Senate Bill 202*, 622 F. Supp. 3d 1312, 1327-29 (N.D. Ga. 2022) ("*S.B. 202 I*") (finding that through their line warming activities, the plaintiff organizations "intend[ed] to convey a message that voting is important and that voters should remain in line to ensure their participation in the democratic process," and, further, that voters understood the line warming activities to convey a message of support and encouragement for their choice to exercise their right to vote). A Florida district court similarly found line warming to be expressive conduct and thus subject to the protections of the First Amendment following a bench trial. *See League of Women Voters of Fla., Inc.* v. *Lee*, 595 F. Supp. 3d 1042, 1129-30 (N.D. Fla. 2022) ("*LOWV*") (finding line warming to be expressive conduct, in part, because plaintiffs communicate to voters "that their determination to exercise the franchise is important and

31

celebrated"), *reversed in part on other grounds sub nom. League of Women Voters of Fla. Inc.* v. *Fla. Sec'y of State*, 66 F.4th 905 (11th Cir. 2023).[8]

Further, Plaintiff provided credible testimony from a voter, Kayla Hart, who explained that the line warming efforts she experienced in Georgia conveyed a "message that the volunteers cared about [her] right to vote, appreciated that [she] was [] exercis[ing] that right, and wanted to make sure that [she] was able to cast [her] ballot." (Hart Decl. ¶ 13; *see also* Bakiriddin Decl. ¶ 10 (testifying that she herself has experienced food sharing as a "sign of welcome")). *See S.B. 202 II*, 2023 WL 5334617, at *8 (crediting similar testimony from voters); *S.B. 202 I*, 622 F. Supp. 3d at 1327-29 (same).

Contrary to Defendants' assertions, the fact that Ms. Hart testified about her experience receiving line warming in Georgia — not New York — is of little importance. (Def. Br. 12). As the Court noted in its prior opinion, line warming was lawful in Georgia prior to the enactment of the statutes challenged in *LOWV*. *See Kosinski I*, 657 F. Supp. 3d at 524-25. New York, by contrast, has maintained some iteration of a line warming ban for more than a

---

[8]     Defendants recycle their argument that "Get Out The Vote" activities and voter assistance programs are generally not protected by the First Amendment. (Def. Br. 13-14). As the Court stated in *Kosinski I*, there is "no [] bright line rule" that the First Amendment does not apply to "conduct that supports voting." 657 F. Supp. 3d at 525. Indeed, the expressive nature of conduct is a factual question evaluated on a case-by-case basis. *See Hurley* v. *Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 567 (1995) ("[T]he reaches of the First Amendment are ultimately defined by the facts it is held to embrace[.]"). And here, the cases Defendants cite in support of their argument are distinguishable, in that they focus on conduct that facilitates voting generally, and not line warming specifically. *See, e.g.*, *Feldman* v. *Ariz. Sec'y of State's Office*, 843 F.3d 366, 392-93 (9th Cir. 2016) (ballot collection); *Voting for Am., Inc.* v. *Steen*, 732 F.3d 382, 388 (5th Cir. 2013) (voter registration drives); *Lichtenstein* v. *Hargett*, 489 F. Supp. 3d 742, 773 (M.D. Tenn. 2020) (distributing absentee ballot applications); *Wise* v. *City of Portland*, 483 F. Supp. 3d 956, 966-67 (D. Or. 2020) (offering medical services).

century.  *Id.*  Given this factual difference, Ms. Hart has experienced line warming in a way that New York voters could not have.  And although Georgia is not New York, much of the "context" surrounding the line warming Ms. Hart received is similar to what Plaintiff anticipates: members of her community offering her food and drink at polling places.  (Hart Decl. ¶¶ 6-7, 12).  *Cf. Zalewska*, 316 F.3d at 320 (distinguishing disparate contexts, such as "the wearing of a black armband in protest during the Vietnam War, compared with other types of activity, like choosing what to wear in the ordinary course of employment").

In sum, because Plaintiff's planned line warming activity communicates a particularized message that is likely to be understood by voters, it is expressive conduct that is protected by the First Amendment.

### 2. The Line Warming Ban Is Not Sufficiently Tailored to Withstand Strict Scrutiny

Having determined that Plaintiff's intended conduct implicates the First Amendment, the Court next considers whether the Line Warming Ban is a justified restriction on that expression.  In line with its opinion in *Kosinski I*, the Court finds that it is not.  657 F. Supp. 3d at 525-29.

### a. The Applicable Level of Scrutiny for the Line Warming Ban Is Strict Scrutiny

The amount of regulation the First Amendment tolerates depends on the type of restriction at issue.  1 Rodney A. Smolla & Melville B. Nimmer, Smolla & Nimmer On Freedom Of Speech § 2:12 (2022) ("[T]he Court does not always

apply the same level of judicial scrutiny to all conflicts involving freedom of speech.").

Laws that target speech "because of the topic discussed or the idea or message expressed" — that is, content-based restrictions — are presumptively unconstitutional and subject to the strictest scrutiny. *Reed* v. *Town of Gilbert*, 576 U.S. 155, 163-64 (2015). Laws that limit only the "time, place, or manner" of protected speech, without regard to the content of that speech, are reviewed under an intermediate level of scrutiny. *Field Day, LLC* v. *County of Suffolk*, 463 F.3d 167, 174 (2d Cir. 2006) (quoting *Clark* v. *Cmty. for Creative Non–Violence*, 468 U.S. 288, 293 (1984)). And laws that do not burden expression at all will withstand judicial review if justified by a rational basis. *See Ku Klux Klan*, 356 F.3d at 208. Plaintiff asserts that, here, the Line Warming Ban is subject to strict scrutiny because it is a content-based restriction on speech. (Pl. Br. 12-14). The Court agrees.

Under Supreme Court precedent, "[g]overnment regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 576 U.S. at 163. "The government's purpose is the controlling consideration." *Ward* v. *Rock Against Racism*, 491 U.S. 781, 791 (1989) (finding that government regulation of expressive activity is content-based if it is justified with reference to the content of the regulated speech).

Here, the Line Warming Ban prohibits only a certain category of expression: gifting "any meat, drink, tobacco, refreshment or provision" to

34

persons other than specified election and campaign officials "in connection with ... any election[.]"  N.Y. Elec. Law § 17-140.  It does not prohibit *all* communication with voters, but instead selectively carves out line warming.  As the Court explained in *Kosinski I*, Plaintiff could, for example, express its support for voting through written or spoken word, or approach voters in line for commercial solicitation, and not run afoul the Line Warming Ban.  *See Kosinski I*, 657 F. Supp. 3d at 527.  Because the Ban uniquely targets a specific category of expressive conduct (offering or providing certain items to voters) around the polling place but permits expression on other topics, it is a content-based regulation.  *See Burson*, 504 U.S. at 197-98 (deeming law restricting campaign-related speech within one hundred feet of polling places a content-based restriction); *see also S.B. 202 I*, 622 F. Supp. 3d at 1320-24 (determining that Georgia's line warming ban is a content-based speech regulation subject to strict scrutiny).

For these reasons, the Line Warming Ban is a content-based restriction of speech, thereby foreclosing Defendants' view that intermediate scrutiny as set forth in *O'Brien* should apply.  Rather, and as discussed above, intermediate scrutiny is applicable only when "the governmental purpose in enacting the regulation is unrelated to the suppression of expression."  *City of Erie* v. *Pap's A.M.*, 529 U.S. 277, 289 (2000); *see also Holder* v. *Humanitarian Law Proj.*, 561 U.S. 1, 27 (2010) ("*O'Brien* does not provide the applicable standard for reviewing a content-based regulation of speech[.]").

### b.   The Line Warming Ban Fails to Survive Strict or Intermediate Scrutiny

As it happens, the distinction between strict and intermediate scrutiny is immaterial, because the Line Warming Ban fails under either standard. Intermediate scrutiny requires that the challenged restriction must be "narrowly tailored," meaning it is "no greater than is essential" to achieve the state's substantial interest. *Young* v. *N.Y.C. Trans. Auth.*, 903 F.2d 146, 157 (2d Cir. 1990) (quoting *O'Brien*, 391 U.S. at 377). In other words, the regulation "need not be the least restrictive or least intrusive means" of achieving the state's goal, as strict scrutiny would require, but the state still must show that its interest "would be achieved less effectively absent the regulation." *Ward*, 491 U.S. at 798-99 (internal quotation marks omitted).

Here, the State Board claims a compelling interest in "insulating voters from real or perceived interference, undue influence, and intimidation during the voting process." (Def. Br. 15 (quoting Connolly Decl. ¶ 27)).[9] *See Burson*, 504 U.S. at 199 (recognizing that states have a compelling interest in "protecting voters from ... undue influence" and intimidation); *see also Silberg* v. *Bd. of Elecs.*, 272 F. Supp. 3d 454, 469-70 (S.D.N.Y. 2017) (recognizing New York's compelling interests in preventing election fraud and

---

[9]   While the Supreme Court has recognized that states have a compelling interest in "protecting voters from ... undue influence" and intimidation, *Burson* v. *Freeman*, 504 U.S. 191, 199 (1992), it has not held that the interest extends so far as protecting voters from "perceived" influence at the polls. And although some courts have suggested that states may have an interest in protecting against the public perception that *elected officials* have been unduly influenced or corrupted by political contributions, that interest is not implicated here. *See, e.g., Ognibene* v. *Parkes*, 671 F.3d 174, 183 (2d Cir. 2011).

"protecting voters from confusion and undue influence" (internal quotation omitted)).

The Line Warming Ban, however, is not sufficiently tailored to serve this purpose. The Ban criminalizes a vast amount of conduct not implicated by the state's interest in protecting voters from undue influence or pressure, while simultaneously addressing conduct that is already proscribed by other New York election laws. For one thing, by its plain terms, the Line Warming Ban potentially reaches the entirety of New York's geographic territory as it applies at *any* distance from New York's voting locations, so long as the gift-giving is "in connection with or in respect of any election during the hours of voting." N.Y. Elec. Law § 17-140. Thus, while the state has a legitimate interest in protecting voters from being influenced near the polls, the Ban reaches substantially more speech than necessary to prevent voter intimidation. As the *S.B. 202 I* court found in addressing a similar ban, "it is improbable that a limitless [geographic scope] would be permissible." 622 F. Supp. 3d at 1339; *see also Burson*, 504 U.S. at 210-11 (upholding Tennessee's ban on electioneering within 100 feet of polling places, reasoning that this "minor geographic limitation" on speech was not "a significant impingement" on speakers' First Amendment rights, but noting that "[a]t some measurable distance from the polls, ... governmental regulation of vote solicitation could effectively become an impermissible burden"); *Russell* v. *Lundergan-Grimes*, 784 F.3d 1037, 1053 (6th Cir. 2015) (rejecting a 300-foot buffer zone because the state "did not present any evidence ... justifying a no-speech zone nine

times larger than the one previously authorized by the Supreme Court [in *Burson*] and offer[ed] no well-reasoned argument" for a restricted area of that size).

Beyond mere geography, the Line Warming Ban's broad substantive reach further demonstrates that it is not narrowly tailored to the state's asserted interest.  In addition to banning gift-giving with partisan intention, the Line Warming Ban bars *nonpartisan* line warming efforts, like those contemplated by Plaintiff.  Indeed, it criminalizes not just attempts to provide refreshments for the purpose of intimidating voters or influencing voters to support particular candidates or issues — both otherwise illegal under New York law, *see* N.Y. Elec. Law §§ 8-104 (prohibiting overtly partisan speech within the 100-foot zone), 17-212 (prohibiting "acts of intimidation, deception, or obstruction" affecting voter access to the franchise) — but *any* form of food or beverage sharing, regardless of message or intent.  As the Court found in *Kosinski I*, it is not clear that "offering a voter a bottle of water and a granola bar, with no mention of any candidate or issue on the ballot, could impair a citizen's ability to vote freely for the candidates of their choice, or that such conduct would be taken as expressing a preference for any candidate, party, or issue."  657 F. Supp. 3d at 529.[10]  Thus, the Ban criminalizes a large amount

---

[10]     The State Board cannot overcome strict or intermediate scrutiny simply by speculating that somebody, somewhere, "may" interpret line warming as "harassment and/or intimidation."  (Def. Br. 17).  *Cf. N.Y. C.L. Union* v. *N.Y.C. Transp. Auth.*, 675 F. Supp. 2d 411, 438 (S.D.N.Y. 2009) ("[T]he Court has little trouble holding that, as a matter of law, Defendant's speculation about the likelihood that a respondent will be chilled from attending his or her own [Transit Adjudication Bureau] hearing fails to justify Defendant's blanket 'respondent controls' public access policy.").

of protected speech having nothing to do with the state's interest (*e.g.,* forbidding nonpartisan line warming), while permitting many types of other interactions — so long as those interactions are not accompanied by gifts of food or water — that are far more closely tied to those same interests (*e.g.,* permitting partisan organization to distribute literature to voters waiting in line outside a 100-foot radius from the poll site).

Because the Line Warming Ban is insufficiently tailored to survive intermediate scrutiny under *O'Brien*, it certainly does not withstand strict scrutiny.  A speech restriction survives strict scrutiny only if it is "the least restrictive means of achieving a compelling state interest."  *McCullen* v. *Coakley*, 573 U.S. 464, 478 (2014).  There are several less restrictive means available, including some that the state has already enacted.  For example, New York already has a prohibition on electioneering within 100 feet of polling places, as well as prohibitions on displaying a marked ballot, voter intimidation, and vote buying.  *See* N.Y. Elec. Law §§ 8-104(1), 17-130(10), 17-142, 17-212.  (*See also* Pl. Ex. 44 (New York Attorney General citing several provisions of law that protect voters from intimidation and not including the Line Warming Ban)).  As the Supreme Court has made clear, a law is not the least restrictive means of achieving the state's goal if the only conduct it legitimately proscribes is already criminalized by other state laws.  *McCullen*, 573 U.S. at 490-92 (holding that Massachusetts law creating abortion clinic "buffer zones" could not meet the tailoring requirement because the challenged law had a separate provision that already prohibited much of the conduct the

39

state's asserted interest sought to address, as did other "generic criminal statutes"). And here, Defendants have not explained what kind of intimidation or harassment might be covered by the Line Warming Ban that is not already subject to criminal penalties under these other laws.

In conclusion, because the Line Warming Ban is not narrowly tailored to promote New York's interest in preventing voter harassment and intimidation, the Ban impermissibly restricts expressive conduct protected by the First Amendment.

**C.    The Line Warming Ban Is Facially Overbroad in Violation of the First Amendment**

Plaintiff asserts that the Line Warming Ban must also be struck down for the independent reason that it is unconstitutionally overbroad. The Supreme Court has recognized that First Amendment "freedoms need breathing space to survive," because "persons whose expression is constitutionally protected may well refrain from exercising their rights for fear of criminal sanctions provided by a statute susceptible of application to protected expression." *Gooding* v. *Wilson*, 405 U.S. 518, 521-22 (1972) (quoting *NAACP* v. *Button*, 371 U.S. 415, 433 (1963)). As a result, the "government may regulate in the area only with narrow specificity," and speech regulations must "be carefully drawn or be authoritatively construed to punish only unprotected speech and not be susceptible of application to protected expression." *Id.* at 522 (quoting *Button*, 371 U.S. at 433).

"[I]mprecise laws can be attacked on their face under two different doctrines." *City of Chicago* v. *Morales*, 527 U.S. 41, 52 (1999). "First, the

overbreadth doctrine permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial when 'judged in relation to the statute's plainly legitimate sweep.'" *Id.* (quoting *Broadrick* v. *Oklahoma*, 413 U.S. 601, 612-15 (1973)). "Second, even if an enactment does not reach a substantial amount of constitutionally protected conduct, it may be impermissibly vague because it fails to establish standards for the police and public that are sufficient to guard against the arbitrary deprivation of liberty interests." *Id.*

"The first step in overbreadth analysis is to construe the challenged statute." *United States* v. *Williams*, 553 U.S. 285, 293 (2008). The second step is to determine whether the challenged statute "criminalizes a substantial amount of protected expressive activity." *Id.* at 297.

The Court finds the Line Warming Ban to be facially invalid under the First Amendment because, for the reasons just described, it punishes a substantial amount of protected speech relative to its legitimate sweep. *See Virginia* v. *Hicks*, 539 U.S. 113, 122 (2003). The Ban restricts the expressive act of offering food and drink to voters in encouragement of their exercise of the franchise. Even if some limitations on this protected right were permissible, such as prohibiting partisan line warming within a narrow radius of polling places, the Line Warming Ban extends far beyond those limitations. It prohibits both partisan and nonpartisan line warming within potentially all of New York State. Thus, like the similar ban in Florida, it "consumes vast

swaths of core First Amendment speech," *LOWV*, 595 F. Supp. 3d at 1138, and is unconstitutionally overbroad.

The State Board's arguments to the contrary are unpersuasive.  First, the State Board contends that the Line Warming Ban indeed erects a "zone of repose" because, under the State Board's construction of the statute, it extends only to the end of the voting line.  (Def. Br. 16 ("The phrase 'in connection with or in respect of any election' should be interpreted as only applying to voters actively engaged in the act of voting.")).  However, the State Board's proposed geographic limitation is neither a reasonable nor readily apparent interpretation of the statute.  If the Legislature meant to restrict the application of the Ban to only "voters" and only while they were in line at a polling place, it could easily have done so.  Instead, it made the Ban broadly applicable to "any person" "in connection with or in respect of any election" "during the hours of voting."  N.Y. Elec. Law § 17-140.

But even if the Court were to adopt that construction, it would not save the Ban from overbreadth.  Even under the State Board's limiting construction, the geographic zone in which the Line Warming Ban applies "has no fixed line of demarcation and no limit," because it would be "tied to the position of the voter in line and fluctuate[] based on the location of the voter." *S.B. 202 I*, 622 F. Supp. 3d at 1338.  Thus, in practice, the geographic limit "could easily extend thousands of feet away from the polling station ... given the documented hours-long lines that voters at some polling locations have experienced." *Id.* at 1338-39.

The State Board next contends that its interests "cannot be achieved by restricting only overtly partisan speech." (Def. Br. 25). That is because, in the State Board's view, the Ban is necessary to address "subtle" or "perceived" forms of interference, influence, and intimidation, and it is impossible to police the motivations of persons providing voters with food and drink. *Id.* But the state cannot broadly prohibit otherwise protected speech simply because, in its view, some voters may possibly perceive it as influencing or intimidating, or because it is too hard to distinguish legitimately proscribed speech from protected speech. *Cf. Nitke* v. *Ashcroft*, 253 F. Supp. 2d 587, 600 (S.D.N.Y. 2003) (per curiam) (three-judge district court) ("[T]he method by which an obscenity statute distinguishes between obscenity and non-obscene speech can determine whether it is overbroad, or whether it is drawn with sufficient precision to withstand constitutional scrutiny."). Moreover, New York law already distinguishes between nonpartisan and partisan actors. For example, Section 8-104 of the New York Election Code prohibits "overtly partisan speech" within the 100-foot zone, but not other forms of speech. N.Y. Elec. Law § 8-104(1).

## D. The Line Warming Ban Is Impermissibly Facially Vague in Violation of the Due Process Clause of the Fourteenth Amendment

Finally, the Court finds the Line Warming Ban to be unconstitutionally vague. *See Morales*, 527 U.S. at 52. The Due Process Clause of the Fourteenth Amendment ensures that "no one may be required ... to speculate as to the meaning of penal statutes." *Farrell* v. *Burke*, 449 F.3d 470, 484-85 (2d Cir. 2006) (alteration adopted). It requires that parties who enforce criminal laws

43

and the parties who are regulated by them have fair notice of what conduct is permitted and what conduct is criminal. *Williams*, 553 U.S. at 304. In other words, the vagueness doctrine ensures that statutes are drafted "with sufficient clarity to give the person of ordinary intelligence a reasonable opportunity to know what is prohibited and to provide explicit standards for those who apply them." *Thibodeau* v. *Portuondo*, 486 F.3d 61, 65 (2d Cir. 2007) (internal quotation marks omitted). Thus, "[a] statute can be impermissibly vague for either of two independent reasons. *First*, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. *Second*, if it authorizes or even encourages arbitrary and discriminatory enforcement." *VIP of Berlin, LLC* v. *Town of Berlin*, 593 F.3d 179, 186 (2d Cir. 2010) (internal citation omitted).

The first basis for finding vagueness — lack of warning to regulated parties — is an "objective one" that requires courts to assess "'whether the law presents an ordinary person with sufficient notice of or the opportunity to understand what conduct is prohibited or proscribed,' not whether a particular plaintiff actually received a warning that alerted him or her to the danger of being held to account for the behavior in question." *Dickerson* v. *Napolitano*, 604 F.3d 732, 745-46 (2d Cir. 2010) (quoting *Thibodeau*, 486 F.3d at 67).

"[V]agueness in the law is particularly troubling when First Amendment rights are involved." *Farrell*, 449 F.3d at 485. Where, as here, the statute at issue is "capable of reaching expression sheltered by the First Amendment, the vagueness doctrine would demand a greater degree of specificity than in other

44

contexts." *Melendez* v. *City of New York*, 16 F.4th 992, 1015 (2d Cir. 2021)

(alternations adopted) (quoting *Commack Self-Serv. Kosher Meats, Inc.* v.

*Hooker*, 680 F.3d 194, 213 (2d Cir. 2012)).  That is because "where a vague

statute abuts upon sensitive areas of basic First Amendment freedoms, it

operates to inhibit the exercise of those freedoms.  Uncertain meanings

inevitably lead citizens to steer far wider of the unlawful zone than if the

boundaries of the forbidden areas were clearly marked." *Grayned* v. *City of

Rockford*, 408 U.S. 104, 109 (1972) (internal quotation marks omitted and

alterations adopted). Statutes that restrict protected speech or association are

therefore held to a "more stringent" vagueness test than statutes that do not

implicate fundamental rights.  *Holder*, 561 U.S. at 19.

     Applying these principles, the Court holds that the Line Warming Ban is

facially vague because it fails to provide persons of reasonable intelligence

notice of what conduct it prohibits.  In its entirety, the Ban provides:

> Any person who directly or indirectly by himself or
> through any other person in connection with or in
> respect of any election during the hours of voting on a
> day of a general, special or primary election gives or
> provides, or causes to be given or provided, or shall pay,
> wholly or in part, for any meat, drink, tobacco,
> refreshment or provision to or for any person, other
> than persons who are official representatives of the
> board of elections or political parties and committees
> and persons who are engaged as watchers, party
> representatives or workers assisting the candidate,
> except any such meat, drink, tobacco, refreshment or
> provision having a retail value of less than one dollar,
> which is given or provided to any person in  a polling
> place without any identification of the person or entity
> supplying such provisions, is guilty of a Class A
> misdemeanor.

N.Y. Elec. Law § 17-140.  Notwithstanding the statute's confusing structure, Plaintiff asserts that its terms lack the specificity required of criminal statutes. For reasons similar to those articulated in *Kosinski I*, the Court largely agrees.

Specifically, the Court finds the phrase "in connection with or in respect of any election" to be indeterminate because it does not provide any territorial limitation.  N.Y. Elec. Law § 17-140.  Indeed, the phrase potentially encompasses all manner of food and drink sharing at any distance from a polling place.  As the Court noted in its prior opinion, it is not apparent on the face of the statute whether it would apply to an individual who offers snacks to voters in the polling place parking lot before they get in line to vote, or whether it bars Plaintiff from distributing snacks to New York voters on election day at its Brooklyn headquarters.  *Kosinski I*, 657 F. Supp. 3d at 532-33.  Thus, the phrase "in connection with or in respect of any election," fails to provide those of ordinary intelligence a reasonable opportunity to understand what conduct the Ban prohibits.

The State Board's proposed limiting construction cannot save the statute.  For reasons already stated, the State Board's construction of the phrase "in connection with or in respect of any election" to apply only to "the period from when a voter enters a line to vote at a polling place until after the voter has cast his or her vote and exited the polling place" (Def. Br. 16), is not readily apparent.  *See Boos* v. *Barry*, 485 U.S. 312, 330 (1988) ("[F]ederal courts are without power to adopt a narrowing construction of a state statute unless such a construction is reasonable and readily apparent.").

46

As an initial matter, the State Board's proposed construction lacks any support in the statute's text. The statute, which restricts conduct related to "any person" "in connection with or in respect of any election," does not on its face contain the State Board's proposed limitation that the Ban is limited only to "voters" and only while they were in line at a polling place. If the Legislature intended such restrictions it could have done so; indeed, the Ban contains other narrowly defined exceptions to its applicability. *See* N.Y. Elec. Law § 17-140 (applying to "any person, *other than persons* who are official representatives of the board of elections or political parties and committees and persons who are engaged as watchers, party representatives or workers assisting the candidate" (emphasis added)).

The State Board's proposed limiting construction is also contradicted by its own account of the Ban's history and purpose. By the State Board's reckoning, the Ban was originally adopted to address the "carnival-like atmosphere that had developed at or around the polls during an election." (Def. FFCL ¶ 7; Connolly Decl. ¶ 19). The State Board provides examples: in September 1860, the "Douglas Democrats" allegedly hosted a "Grand Political Carnival and Ox-roast." (Connolly Decl. ¶ 5). In October 1876, "there was a 'grand Republican barbecue'" held in Brooklyn. (*Id.* ¶ 6). Neither of these events was held in the vicinity of the polls — or indeed, even on election day. *Id.* Neither event, therefore, would be covered by the phrase "in connection with or in respect of any election," as the State Board interprets it. And yet, the State Board's deputy executive director, Mr. Connolly, testifies that both

47

events were held "in connection with" the 1860 and 1876 presidential elections. (*Id.* ¶¶ 5, 6).

In short, the term "in connection with or in respect of any election" is not "readily susceptible" to any narrowing construction that saves the Ban from vagueness, and federal courts "may not rewrite a state law to conform it to constitutional requirements." *Vt. Right to Life Comm., Inc.* v. *Sorrell*, 221 F.3d 376, 386 (2d Cir. 2000) (alteration adopted and citation omitted). For these reasons, the Court finds that the Line Warming Ban is also unconstitutionally vague.

## CONCLUSION

Based upon the above Findings of Fact and Conclusions of Law, the Court DECLARES that Section 17-140 of the New York Election Law (i) violates the First Amendment right to free speech and expression; (ii) violates the First and Fourteenth Amendments to the United States Constitution because it is impermissibly overbroad; and (ii) violates the First and Fourteenth Amendments to the United States Constitution because it is impermissibly vague. Accordingly, the Court hereby GRANTS Plaintiff's request for a permanent injunction. Neither Defendants, nor their respective agents, officers, employees, and successors, nor any persons acting in concert with any of them, shall enforce Section 17-140 of the New York Election Law.

The parties are directed to submit a joint letter to the Court on or before

**June 14, 2024**, proposing next steps in this litigation.

SO ORDERED.

Dated:       May 30, 2024
             New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

49